[Cite as *State v. Mitchell*, 2019-Ohio-2465.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                  :
                                      :
      Plaintiff-Appellee       :     Appellate Case No. 28280
                                        :
v.                            :     Trial Court Case No. 2018-CR-4586
                                        :
AARON MITCHELL         :     (Criminal Appeal from
                                        :     Common Pleas Court)
      Defendant-Appellant  :
                                        :

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of June, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

DANIEL B. RHODES, Atty. Reg. No. 0089545, Assistant Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Aaron Mitchell appeals from a judgment sustaining the State of Ohio's motion for no bond. According to Mitchell, the trial court abused its discretion because the State failed to establish the required factors in R.C. 2937.222 by clear and convincing evidence.

{¶ 2} We conclude that the trial court did not err in requiring that Mitchell be held without bond. Ample evidence supported the court's findings that Mitchell posed a substantial risk of serious physical harm to police officers and the community and that no conditions of release would reasonably assure their safety. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} On November 30, 2018, Clay Township Patrol Sergeant James Hawkins was in a meeting with the police chief at the police station on Arlington Road in Clay Township, Ohio. The building housed administrative offices as well as the police station. During the meeting, Hawkins and the chief heard seven to ten shots being fired outside the building. At that point, Hawkins exited the building from the north door, which was the exit and entrance that the police used. The door was recessed about a foot, and Hawkins used that for cover. As he exited, he saw a black Pontiac Fiero automobile stopped on Arlington Road in the northbound lane. A male (later identified as Mitchell), was in the Fiero, with a rifle sitting on the open side door of the car. When Hawkins screamed at him to drop the gun, Mitchell fired shots.

{¶ 4} Hawkins continued to scream at Mitchell to drop the gun, but Mitchell flipped him off, revved his engine, and began to travel north on Arlington Road. A chase then ensued, which involved Hawkins and officers from other jurisdictions. During the chase,

Mitchell drove more than 80 miles per hour at times, ran two stop signs, and drove through spike strips. He was then stopped in the intersection of Diamond Mill Road and Kimmel Road, in Montgomery County, Ohio. When the chase was approaching the spike strips, another officer radioed that Mitchell had a brown assault rifle in his lap.

{¶ 5} After the stop, Hawkins exited his vehicle and began screaming, "Show me your hands, show me your hands." Transcript of Proceedings ("Tr.") at p. 20. Hawkins saw the barrel of the rifle come up and screamed "gun" to alert the other officers. He then began screaming at Mitchell to drop the gun. At that point, Mitchell opened the car door and flipped off the officers. Mitchell then placed his foot out of the door, put his left hand on the barrel of the rifle, and began to exit his car. As Mitchell grabbed the barrel and rotated out of the car, the barrel came in Hawkins' direction and toward the other officers at the scene. Because Hawkins believed Mitchell was going to cause serious physical harm or kill the officers, he fired. Mitchell then threw the gun out of the car, and a trooper approached the car with a ballistic shield.

{¶ 6} Although Mitchell had been given commands to exit the car, he did not do so; as a result, Hawkins holstered his firearm and removed Mitchell from the car. When Mitchell was removed, he had an open can of Bud Ice in his hand. Mitchell had been shot multiple times and was transported to the hospital.

{¶ 7} During the incident, Mitchell used a 4095 High Point rifle, which had a magazine that contained 8 rounds. The magazine for that rifle can hold 10 rounds. A subsequent search of Mitchell's car uncovered an empty magazine for the rifle and shell casings on the vehicle's floorboard.

{¶ 8} Mitchell was initially arraigned in municipal court, where a bond of $150,000

was set. Subsequently, on December 13, 2018, an indictment was filed in Montgomery County Common Pleas Court, charging Mitchell with five counts: (1) felonious assault (police officer – deadly weapon), in violation of R.C. 2903.11(A)(2), a first degree felony, with firearm specifications of seven years (discharging at officer), five years, and three years; (2) discharge of a firearm on or near prohibited premises (serious physical harm) in violation of R.C. 2923.162(A)(3), a third-degree felony, with a three-year firearm specification; (3) failure to comply with an order or signal of a police officer (serious physical harm), in violation of R.C. 2921.331(B) and (C)(5), a third-degree felony; (4) failure to comply with an order or signal of a police officer (fleeing felony), in violation of R.C. 2921.331(B) and (C)(4), a fourth-degree felony; and (5) felonious assault (police officer – deadly weapon) in violation of R.C. 2903.11(A(2), a first degree felony, with a three-year firearm specification.

{¶ 9} Following the indictment, the trial court continued the prior bond. Mitchell remained in jail until January 8, 2019, when his father posted the $150,000 bond. Shortly thereafter, on January 11, 2019, the State filed a motion for no bond. Alternatively, the State asked the court to increase the bond to $1,000,000. The court then set a hearing for January 16, 2019, and ordered that Mitchell be taken into custody and detained in jail until the ruling on the motion.

{¶ 10} On January 16 and 17, 2019, the court held hearings, during which the State and Mitchell both presented evidence. The court then issued an order on January 18, 2019, granting the State's motion for no bond. Mitchell timely appealed from the court's order.

## II.   Alleged Abuse of Discretion in Granting No Bond Motion

{¶ 11} Mitchell's sole assignment of error is as follows:

The Trial Court Abused Its Discretion in Deciding to Hold Defendant-Appellant Without Bond Because the State Failed to Establish the Enumerated Factors of R.C. 2937.222 by Clear and Convincing Evidence.

{¶ 12} According to Mitchell, the trial court erred by failing to consider legitimate issues about the most serious charges, which would significantly reduce his potential prison sentence.   He further contends that he does not pose a risk of substantial harm to the community and that conditions of release exist that will reasonably assure the community's safety.

{¶ 13} In this case, the State's motion was made pursuant to R.C. 2937.222.   The statute provides, as pertinent here, that "[o]n the motion of the prosecuting attorney or on the judge's own motion, the judge shall hold a hearing to determine whether an accused person charged with * * * a felony of the first or second degree * * * shall be denied bail." R.C. 2937.222(A).

{¶ 14} Two of Mitchell's alleged felonies qualified, as they were first-degree felonies. These counts (one and five), both involved felonious assault on a police officer by use of a deadly weapon, in violation of R.C. 2903.11(A)(2).   Under the no-bond statute, "the state has the burden of proving that the proof is evident or the presumption great that the accused committed the offense with which the accused is charged, of proving that the accused poses a substantial risk of serious physical harm to any person or to the community, and of proving that no release conditions will reasonably assure the safety of that person and the community."   R.C. 2937.222(A).   The Ohio Revised Code

defines a "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 15} R.C. 2937.222(B) further provides that:

No accused person shall be denied bail pursuant to this section unless the judge finds by clear and convincing evidence that the proof is evident or the presumption great that the accused committed the offense described in division (A) of this section with which the accused is charged, finds by clear and convincing evidence that the accused poses a substantial risk of serious physical harm to any person or to the community, and finds by clear and convincing evidence that no release conditions will reasonably assure the safety of that person and the community.

{¶ 16} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. *Accord State v. Urso*, 11th Dist. Trumbull No. 2010-T-0042, 2010-Ohio-2151, ¶ 40 (applying the same definition in a case involving R.C. 2937.222).

{¶ 17} Typically, where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof. *Cross* at 477. *See also In re Adoption of Lay*, 25 Ohio St.3d 41, 42, 495 N.E.2d 9 (1986) (review

of adoption decisions); *In re Z.W.*, 2d Dist. Montgomery No. 23657, 2010-Ohio-1619, ¶ 28 (review of permanent custody decisions); *State v. Portis*, 2d Dist. Clark No. 2012-CA-76, 2013-Ohio-1822, ¶ 16-19 (review of decision on motion for new trial); *In re P.A.*, 10th Dist. Franklin No. 17AP-728, 2018-Ohio-2314, ¶ 13 (review of decision involuntarily committing mentally ill person).

{¶ 18} R.C. 2937.222 has been in effect since 1999, after the Ohio Constitution was amended to let courts deny bail in certain situations. *See Smith v. Leis*, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 38-42. The statute was enacted to provide procedures for denying bail. *Id.* at ¶ 41-42, citing Ohio Constitution, Article I, Section 9. However, many districts, including our own, have not considered the statute. Despite this, a difference of opinion exists about the applicable standard of review.

{¶ 19} For example, the Tenth District Court of Appeals has applied an abuse of discretion standard. *State v. Henderson*, 10th Dist. Franklin No. 16AP-870, 2017-Ohio-2678, ¶ 5, citing *State v. Foster*, 10th Dist. Franklin No. 08AP-523, 2008-Ohio-3525, ¶ 6. The Tenth District's application of this standard was based on the fact that the abuse of discretion standard is customarily used in habeas cases challenging excessive bail. *Foster* at ¶ 5, citing *In re DeFronzo*, 49 Ohio St.2d 271, 361 N.E.2d 448. (Other citation omitted.) *Foster* also relied on dicta from *Smith v. Leis*, which was a habeas case. *Id.*, citing *Smith* at ¶ 82.

{¶ 20} " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' " *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). It also includes

arbitrary or unconscionable decisions. *AAAA Ents*. at 161.

{¶ 21} In contrast, the Eleventh District Court of Appeals has applied the standard for reviewing suppression decisions. *Urso*, 11th Dist. Trumbull No. 2010-T-0042, 2010-Ohio-2151, at ¶ 47. The court reached this decision after reviewing federal authority pertaining to pretrial detention under the Bail Reform Act, 18 U.S.C. 3145, and finding that federal standards are "roughly equivalent" to standards for reviewing suppression decisions. *Id*. at ¶ 42-46. As a result, the court held that "in reviewing factual determinations of the trial court, an appellate court reviewing a motion to deny bail is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence. Accepting these facts as true, the appellate court independently reviews the trial court's legal determinations de novo." *Id*. at ¶ 47.

{¶ 22} The Sixth District Court of Appeals has used a standard consistent with review of cases involving "clear and convincing evidence." *See State v. Brown*, 6th Dist. Erie No. E-06-025, 2006-Ohio-3377, ¶ 25 (characterizing the issue as whether "sufficient evidence" supported the trial court's findings). Another district did not specifically articulate a standard of review. *See State v. Michael*, 5th Dist. Tuscarawas No. 2009 AP 11 0059, 2010-Ohio-2587, ¶ 32 (stating only that "we find the trial court's decision is clearly supported by clear and convincing evidence and the trial court did not err in denying bail").

{¶ 23} According to the State, the Eleventh District's approach is preferable because R.C. 2937.222 does not allow trial courts any discretion. Specifically, a trial court is statutorily required to hold a hearing and weigh the evidence to decide if a defendant must be held without bond. We disagree that this, in and of itself, means that

an abuse of discretion standard could not apply. In other situations, an abuse of discretion standard applies where courts are statutorily required to hold hearings and make decisions. *E.g., State v. Wilson*, 2d Dist. Montgomery No. 26488, 2015-Ohio-3167, ¶ 10-11 (R.C. 2929.18(A)(1) requires courts to hold hearings if they decide to impose restitution and the amount is disputed; the court's decision is then reviewed for an abuse of discretion).

{¶ 24} We need not resolve these conflicts, however, because the trial court's decision was correct under any of these standards. According to the statute:

The judge, in determining whether the accused person described in division (A) of this section poses a substantial risk of serious physical harm to any person or to the community and whether there are conditions of release that will reasonably assure the safety of that person and the community, shall consider all available information regarding all of the following:

(1) The nature and circumstances of the offense charged, including whether the offense is an offense of violence or involves alcohol or a drug of abuse;

(2) The weight of the evidence against the accused;

(3) The history and characteristics of the accused, including, but not limited to, both of the following:

(a) The character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, and

criminal history of the accused;

(b) Whether, at the time of the current alleged offense or at the time of the arrest of the accused, the accused was on probation, parole, post-release control, or other release pending trial, sentencing, appeal, or completion of sentence for the commission of an offense under the laws of this state, another state, or the United States or under a municipal ordinance.

(4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

R.C. 2937.222(C).

**{¶ 25}** Consistent with the statute, the trial court discussed each factor in detail and found that each weighed in favor of granting the State's motion for no bond. We will review these findings.

### A. Nature and Circumstances of Charged Offenses

**{¶ 26}** After reviewing the evidence, the trial court found that Mitchell "deliberately, recklessly, and alarmingly endangered the lives of law enforcement officers and civilians." Doc. #33, p. 3. The acts in question included discharging a firearm in the direction of the Clay Township administration building, which housed police officers; by firing two shots at Sgt. Hawkins when he exited the building; by engaging in a long high-speed pursuit and driving in excess of 80 miles per hour; by running two stop-signs, one of which included a busy intersection at which he did not yield to oncoming traffic; and by continuing to point a loaded firearm at police after he was stopped. *Id.* The trial court

was not persuaded by Mitchell's argument that no one was injured and that he did not ram any police cruisers. *Id*.

{¶ 27} The court's conclusions are well-supported by the evidence, about which there was little, if any dispute. Mitchell was an alcoholic who had been diagnosed with cirrhosis of the liver in May 2018. When Mitchell was released from the hospital, his doctors told him that if he continued to drink alcohol, it would kill him. For several months, Mitchell did not drink. During this time, his condition prevented him from working. However, about three weeks before the November 30, 2018 incident, Mitchell's fiancée found empty beer cans and confronted Mitchell. At that time, Mitchell said that "he was going to drink until the day he died, and that she could either accept that or move on, and that he didn't care if she told his parents or not." Tr. at p. 84.

{¶ 28} On the day of the shooting incident, Mitchell's fiancée confronted him at around 6:30 a.m. Mitchell was already drunk. In a statement to police, the fiancée said:

[Mitchell] went to bed and was back up by 6:30 a.m. and started drinking again. I asked him why he was killing himself with the alcohol, and he said that he'd either drink or kill himself because he had nothing to contribute to the household.

And he also said that he had told me before that if he was going to kill himself he would get as cranked up as he could on alcohol and drugs and go on a high speed chase and have a shootout with the police.

I decided I would rather him drink than do this, but I could not stay home with him, because I had to work. I went to work, and on my way home, tried to call him.

Tr. at pp. 84-85.

{¶ 29} By the time the fiancée called, Mitchell had left the house and did not answer. Before leaving, Mitchell posted about his intention on Facebook. Specifically, Mitchell posted that "my mind says I'm going to break a bunch of laws, and then [sic] chased by the cops, lol." Tr. at p. 77; State's Ex. 7. After leaving the house, Mitchell did precisely what he had threatened. He went to the Clay Township police station, fired his assault rifle several times, and then fired at Sgt. Hawkins when he came outside. Two bullet holes were found in the fence behind where Hawkins was standing, and two bullet holes were found in the Township Road Garage, which was on the property.

{¶ 30} As noted, after firing at the building and at Hawkins, Mitchell embarked on a high-speed attempt to evade the police, and after finally being stopped, he refused to obey police instructions. Instead, he gave police the finger and pointed his rifle at them, which then resulted in his own injury. After being taken to the hospital, Mitchell was surprised that "the medical staff had no idea what he had done, and why he was there, because he was a celebrity, and * * * they should have heard about it by then." Tr. at p. 47.

{¶ 31} As the trial court noted, the lack of injury to others was pure happenstance and was nothing for which Mitchell deserved credit. His actions were extremely reckless and dangerous to the police and the community.

## B. Weight of the Evidence

{¶ 32} Concerning this factor, the trial court observed that the weight of the evidence was very strong. Doc. #33 at p. 3. We agree. There was no question about

Mitchell's identity and the facts were essentially undisputed.

## C. Accused's Character

{¶ 33} Regarding Mitchell's character, the trial court observed that Mitchell was not on probation, parole, or other supervision when the offense occurred, that he had not previously been known as a violent individual, and that since his arrest, he had not had any incidents with correctional officers, nurses, other inmates, or deputies. In addition, the court noted Mitchell's life-threatening cirrhosis; the fact that his condition deprived him of things he had previously enjoyed; that he had again resumed drinking three or four weeks before the incident and had refused to stop despite being implored to do so; and that he was suicidal. In particular, the court commented that Mitchell's "suicide plan involves a substantial risk of serious physical harm to law enforcement." Doc. #33 at p. 4. Based on the discussion above, the court's findings were amply supported by clear and convincing evidence. They were also based on sound reasoning.

{¶ 34} Mitchell argues that he had an incentive to remain out of custody due to his health condition, his many medical appointments, and his parents' concern that he was not receiving adequate care while incarcerated. However, this argument ignores the nature of alcohol addiction and lack of control that Mitchell exhibited by continuing to drink despite knowing it would kill him. Mitchell also focuses on the absence of violence in his past and after his arrest. However, this ignores the violence that occurred on the day of the shooting incident and the fact that nothing has changed with respect to his depression, alcohol addiction, and suicidal disposition.

D. Danger to Persons and the Community

**{¶ 35}** Concerning the last factor in R.C. 2937.222(C), the trial court agreed with the State that Mitchell was suicidal and that jail was the only place where his access to alcohol could be curtailed. The court also agreed that allowing someone in Mitchell's condition to be where alcohol was sold within a short distance of his residence would result in the same risks that existed on the day of the shooting incident, and that this would present a clear danger to community members and law enforcement, including potential death. Doc. #33 at p. 5. Again, the record contains ample support for this conclusion, and the court's findings were based on sound reasoning.

**{¶ 36}** Mitchell contends that circumstances have changed because, if he were confined either at his home or at his parent's home, he would not have access to weapons, alcohol, or vehicles. However, if Mitchell were confined in his own residence, he would be unsupervised for long periods of time, since his fiancée worked two jobs. This residence was also very close to the high school. In addition, Mitchell's fiancée told the police that she feared he would again attempt suicide in the same manner. Tr. at pp. 88 and 137-138.

**{¶ 37}** Even if Mitchell were confined at his parents' home in a more rural area, he could still leave and obtain alcohol. Mitchell's father also admitted that it was possible that Mitchell could overpower him and take off with his car, and that Mitchell could certainly overpower his mother.

**{¶ 38}** As the State points out, Mitchell's argument ignores the violent and dangerous nature of his actions, which endangered the lives of the police and innocent community members on the day of the incident. Furthermore, it ignores the hostility that

Mitchell showed to the police on the day of the incident, not only by firing at them, but also through his gestures and his conduct at the hospital (where he repeatedly flipped off officers and referred to one officer more than once as "the old fat f*cker"). Tr. at p. 50. As noted in a somewhat similar situation:

> It is undisputed that the charges for which bail was denied are first and second degree felonies. It would be difficult to imagine an offense which would produce a greater risk to persons or the community than a deliberate attempt to injure or intimidate a police officer by shooting into his home. Neither can we conceive of a condition of release which would reasonably ensure that one who would commit such an act would not try again. The only question remaining is whether the evidence submitted supports a "great presumption" of appellant's guilt.

*Brown*, 6th Dist. Erie No. E-06-025, 2006-Ohio-3377, at ¶ 26. As noted, there was a great presumption of Mitchell's guilt.

{¶ 39} After reviewing the factors, the trial court concluded that they all weighed against releasing Mitchell on a monetary bond with GPS monitoring and other conditions that Mitchell suggested. The court concluded that there was a demonstrably grave threat to law enforcement officers, and that Mitchell's constant supervision by persons in authority was the only way to reasonably assure the safety of officers and the community. Again, we agree, and there was ample evidence to support the court's order. The court's order was supported by sound reasoning, and the court correctly applied the law.

{¶ 40} Accordingly, Mitchell's sole assignment of error is overruled.

### III.   Conclusion

{¶ 41} Mitchell's assignment of error having been overruled, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Daniel B. Rhodes
Hon. Dennis J. Langer