[Cite as *State v. Williams*, 2022-Ohio-3858.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-22-1012

      Appellee                                   Trial Court No.  CR0202103047

v.

Tyler Williams                                   **DECISION AND JUDGMENT**

      Appellant                                   Decided:  October 28, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Tyler Williams, appeals the January 6, 2022 judgment of the

Lucas County Court of Common Pleas denying him bail under R.C. 2937.222.  For the

following reasons, we affirm.

## I. Background and Facts

{¶ 2} On August 20, 2021, 11-year-old N.S. and 14-year-old M.S. were each shot in the head while playing basketball in front of their house. Both boys were seriously injured. M.S. survived, but has traumatic brain damage that will require multiple surgeries. N.S. died from his injuries two days after the shooting.

{¶ 3} Williams was indicted on six counts related to the shootings: aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; murder in violation of R.C. 2903.02(B), an unclassified felony; two counts of felonious assault in violation of R.C. 2903.11(A)(2), each a second-degree felony; attempted aggravated murder in violation of R.C. 2903.01(A) and R.C. 2923.02, a first-degree felony; and discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a first-degree felony. Each charge also carried a firearm specification under R.C. 2941.145.

{¶ 4} Upon Williams's arrest, the trial court ordered him held without bail and scheduled a hearing to deny bail under R.C. 2937.222. At the hearing, the state called detective Shaun Conklin of the Toledo Police Department ("TPD") to testify. Conklin, the lead investigator in the case involving N.S. and M.S., prepared a PowerPoint presentation with pertinent facts from his investigation that he used throughout his testimony.

{¶ 5} The bulk of Conklin's testimony related to three topics: the facts of the shooting, related criminal activity, and Williams's criminal history.

2.

## A. Facts of the shooting

{¶ 6} Conklin testified that N.S. and M.S. were shot on August 20, 2021, at 7:51 p.m. in front of a house on Austin Street in Toledo. Officers on the scene found shell casings from two different guns at the corner of Austin and Elm Street: 11 casings from a 9 millimeter gun and four casings from a .40 caliber gun. Conklin believed that this indicated that two shooters were involved.

{¶ 7} On August 22, TPD received a tip through Crime Stopper that Williams was responsible for the shooting. The caller provided Williams's address on Mayville Place and said that he drove "a black Ford Focus that was seen at the time of the shooting." Conklin tried to find the black Focus at the Mayville address, but only found a U-Haul truck in the driveway. However, he knew that Williams lived at the address because of "numerous police reports that documented he did, in fact, live there." Conklin also learned that Williams's mother had a black 2010 Ford Focus registered in her name.

{¶ 8} Conklin pieced together the following timeline of events on August 20 using footage from two security cameras, one at St. Vincent Hospital that was pointed at the intersection of Mayville and Page Street and one at a house near the corner of Austin and Elm that was diagonal from the corner where the shooters stood.[1] The St. Vincent camera was pointed directly down Mayville and provided an unobstructed view of

---

[1] During the hearing, the state was unable to get the security video footage embedded in Conklin's PowerPoint presentation to play, but the prosecutor had Conklin describe what was in the videos for the court.

Williams's front porch and the sidewalk in front of his house, albeit from a distance.  The Elm Street camera provided limited views of both Austin and Elm, including the area where N.S. and M.S. were playing when they were shot.

{¶ 9} At 7:42 p.m., two people leave Williams's house, get into a black car, and drive away at 7:44 p.m.  Conklin showed the court an enhanced and magnified picture from the video of the two people who left the Mayville house.  The first person who walked out—whom Conklin called "Tyler"—was wearing "a gray hoodie, * * * black shorts [with] a white stripe with a little bit of red going down the side of the shorts, and * * * bright white tennis shoes."  The second person—whom the police had not been able to identify as of the time of the bond hearing—was wearing a "dark-colored hoodie and blue jeans."

{¶ 10} On cross-examination, Conklin "couldn't say 100 percent that there wasn't somebody in [the black] car * * *" before the two men walked out of the Mayville house and got in the car, "but we believe it was just the two that came out of Mayville."  To support this belief, Conklin explained that the security footage that he reviewed began before the clip that he described for the court, and "[y]ou do not see any activity around the vehicle.  Or, when you Zoom [sic] in, you can't see any activity inside the vehicle to indicate that there was anybody else in there."

{¶ 11} At 7:45 p.m., N.S. and M.S. were playing basketball in front of their house on Austin.  The black Focus drove by on Elm and slowed down, went past the

4.

intersection of Austin and Elm, pulled into an alley, turned around, and drove back down Elm past Austin.  Immediately after passing Austin the second time, the Focus stops and "appears to be watching the boys playing basketball."

{¶ 12} At 7:49 p.m., the Focus drives up Moss Street, which is a block past Austin, and parks near the corner of Moss and Elm.  Conklin testified that the same two suspects who got into the Focus at the house on Mayville got out of the Focus on Moss and walked down Elm toward Austin.  He said that "[y]ou can see the one suspect clearly in the corner, that he's wearing the blue jeans and dark hoodie, raise a firearm up and begin to fire at the two boys playing basketball * * *."  N.S. and M.S. "run from the shooting to the front of their house where they both drop from their injuries, basically, in their front yard."  Conklin said that the shooting happened at "7:50 [p.m.] and some seconds."

{¶ 13} Finally, at 7:54 p.m., the black Focus returns to Mayville, parks in front of Williams's house, and the same two suspects get out of the car and go back inside the house.  The Focus in the video had the same temporary license plate as the Focus registered to Williams's mother.  Conklin testified that he did a "Google map search" to verify the distance between Williams's house on Mayville and the house on Austin.  He found that the houses were ".8 miles away, with an average drive time of three to four minutes[,]" which was consistent with the timestamps on the security videos, and, he

5.

said, "show[ed] that the timeframe of them leaving Mayville and them arriving at Austin and Elm fits."

## B. Related criminal activity

{¶ 14} In addition to the facts immediately related to the August 20 shooting, Conklin testified about other criminal activity that he believed connected Williams to the shooting.

{¶ 15} The first two incidents involved shots being fired into Williams's home. The first time this happened was June 16, 2021. That day, witnesses saw two men on bikes fire several shots at Williams's house. The witnesses also reported that two men came out of the house and fired back at the men on bikes. Police collected several .40 caliber shell casings from in front of the Mayville house—i.e., from the area where the men who came from inside the house were shooting back at the men on bikes—that matched the .40 caliber shell casings found at the scene of the August 20 shooting on Austin Street. Conklin summed up the significance this had for his investigation:

> [A]ll—the .40-caliber casings were fired from the same firearm.
>
> * * *
>
> The fact that the .40-caliber casings were fired from the same gun tells us that that gun came from [the] Mayville [address]. The persons inside [the] Mayville [address] came out with that gun and fired back at the suspects who were shooting at the house. And that tells us that the same

6.

weapon that was used on that night—or day, was used at the scene of the homicide on August 20th, 2021.

It is undisputed that Williams was incarcerated at the Correctional Treatment Facility ("CTF") and did not have physical access to the Mayville house from April 6 to August 18, 2021—including on June 16, 2021.

{¶ 16} Police identified Omar Sykes as a suspect in the June 16 shooting, which Conklin found significant to his investigation because Sykes was a "close family friend" of N.S. and M.S.'s family, and Conklin believed that the August 20 shooting "stemmed from this ongoing feud with the two groups shooting back and forth at each other." Conklin's PowerPoint also noted that a person named Charles Winters told police at the time of the June 16 shooting that his nephew (whose name was not in the PowerPoint), who did not currently reside at the house, "was having an on-going feud with Omar Sykes."

{¶ 17} On cross-examination, Conklin clarified that he was not involved in the investigation of the June 16 incident; his testimony was based on the reports of other officers. Those officers did not have any video footage from June 16 because "the camera that we used for the homicide incident was, basically, installed because of that incident on June 16th." That is, to the best of Conklin's knowledge, there was not a security camera on St. Vincent Hospital that covered the area of Mayville and Page (including Williams's house) on June 16.

7.

{¶ 18} Conklin also said that he and the lead investigator for the June 16 shooting interviewed Sykes about the incident, but Sykes had not been charged and the investigation of the June 16 shooting into Williams's house was ongoing.

{¶ 19} The second incident was on August 22, 2021—two days after N.S. and M.S. were shot—when police again responded to a report of shots fired into Williams's house. Video from a responding officer's body camera showed that Williams was wearing black shorts with a stripe down the side that was white from the waist to the mid-thigh and red from the mid-thigh to the hem. The shorts also appear to have a logo in front of the stripe that is illegible in the photo (taken from the body camera footage) that Conklin included in his PowerPoint. Conklin testified that these were the "same shorts as seen in the video from the shooting." There is also a pair of "bright white tennis shoes" on the floor near where Williams was sitting.

{¶ 20} The next related criminal activity was a traffic stop involving Williams on September 18, 2021. Conklin said that Williams was stopped while driving the black 2010 Ford Focus registered to his mother. During the stop, police found a loaded gun partially concealed under the legs of a passenger, and a baggie of suspected cocaine in Williams's front pants pocket.

{¶ 21} On cross, Conklin said that he was not directly involved in the traffic stop or the subsequent investigation. However, although no felony charges had yet been filed against Williams related to the stop, Conklin believed that the investigation was ongoing

8.

because "there was some kind of analysis still being done of the substance that was located" in Williams's pocket during the stop.

{¶ 22} The final related activity was a police search of Williams's new residence pursuant to a search warrant in December 2021. Police found three pistols and one rifle in the house. Conklin said that Williams was legally prohibited from possessing or being around firearms because he was a convicted felon.

## C. Williams's criminal record

{¶ 23} Finally, Conklin testified to Williams's criminal record. In 2015, when Williams was 13 years old, he and a 15-year-old boy broke into a woman's home, held her at gunpoint, and raped in front of her young daughter. Williams was adjudicated delinquent for committing acts that would be rape and aggravated burglary with a firearm if committed by an adult. Both offenses would be first-degree felonies if committed by an adult. Williams was committed to the Department of Youth Services for five years.

{¶ 24} In June of 2020, Williams was released from DYS and placed on aftercare, the juvenile equivalent of parole.

{¶ 25} In August of 2020—less than two months after his release and while he was still on aftercare—Williams was a passenger in a car that fled from police. During the police chase, Williams threw a bag of fentanyl from the car. When the car stopped, Williams threw a handgun before running away. As a result of this incident, Williams was convicted of possession of fentanyl, a fifth-degree felony, and improperly handling a

9.

firearm in a motor vehicle, a fourth-degree felony. He was placed on community control for two years, which included six months at CTF. Williams was at CTF from April 6 to August 18, 2021.

{¶ 26} The shooting on Austin happened two days after Williams was released from CTF.

### D. Additional information

{¶ 27} To conclude his testimony, the state asked Conklin about Lucas County's electronic monitoring program for people who are released on bail. Conklin said that the program was not the responsibility of the TPD, but, as far as he knew, (1) the department was not staffed 24 hours a day, (2) defendants who were on electronic monitoring were capable of removing the monitoring units that they wore, (3) defendants sometimes did remove the monitoring units, (4) the TPD was not immediately notified when someone removed their monitoring unit, and (5) any person who removed their monitoring unit could remain in the community for an extended period of time without the TPD knowing about it.

{¶ 28} On cross-examination, Conklin said that he sometimes gives the prosecutor input on the bond the state will request, but he was unaware of the state's initial request for a cash bond in Williams's case. Conklin was familiar with the bond reports that the trial court used. He had not seen the bond report in Williams's case, but thought that all of the information that he had testified to regarding Williams's criminal history should

10.

have been in the bond report available to the state at the time it made its request for a cash bond.

{¶ 29} Conklin also explained on cross that, although he believed that the police had probable cause to issue a warrant for Williams's arrest in December 2021, his investigation of the August 20 shooting was ongoing. There was a second suspect—the person wearing a dark hoodie who was seen in the security videos actually shooting a gun—whom the police had not yet identified or arrested.

{¶ 30} Regarding a feud between Williams and Sykes, Conklin agreed with defense counsel that there was no "paper trail" documenting a feud between the men. The evidence that Conklin had of animosity between them was (1) someone at the Mayville house on June 16 saying that Sykes was responsible for that shooting incident, (2) Sykes saying during his interview after the August 20 shooting that he was "good friends with" N.S. and M.S.'s family, and (3) the Crime Stopper tip on August 22 saying that the August 20 shooting "was retaliation." However, "[w]hen asked directly, nobody has alluded to or, you know, explained any kind of feud that has happened. Including Omar Sykes himself. * * * Seems like he wanted to distance himself from the investigation."

## E. Trial court's decision

{¶ 31} After hearing Conklin's testimony, the trial court determined that Williams should be held without bail pursuant to R.C. 2937.222. It found that the state proved by

11.

clear and convincing evidence that (1) the proof was evident and the presumption great that Williams committed the crimes of murder, attempted murder, felonious assault, and discharge of a firearm on or near a prohibited premises, (2) Williams "poses a substantial risk of serious physical harm to both the community at large and to the surviving victim in this case due to the nature of these offenses and the lengths he was, seemingly, willing to go to perpetrate this offense[,]" and (3) no release conditions would reasonably assure the safety of M.S. and the community. The court noted that "[s]ince he was 15, Mr. Williams has been in and out of different custodial settings, and it's evidenced by the timeline that was placed into evidence today by the State of Ohio, he continues to present a great danger to the safety of this community." In addition to ordering Williams held without bail, the trial court ordered that Williams have no contact with M.S. or any of N.S. and M.S.'s family members.

{¶ 32} On January 6, 2022, the trial court filed a judgment entry memorializing its decision on bail. In the entry, the court confirmed that it considered all the available information regarding the factors in R.C. 2937.222(C) and found that the state proved by clear and convincing evidence that (1) "the proof is evident and the presumption great that [Williams] committed * * *" murder, first-degree attempted aggravated murder, and second-degree felonious assault; (2) that Williams posed a substantial risk of serious physical harm to M.S. "due to the nature of these offenses and the lengths he was seemingly willing to go to perpetrate these offenses"; and (3) no release conditions would

12.

"reasonably assure the safety of the surviving victim and of our community."  The court also ordered that Williams have no contact with M.S. or N.S. and M.S.'s family.

{¶ 33} Williams now appeals, raising three assignments of error:

> I. THE TRIAL COURT ERRED IN ORDERING MR. WILLIAMS HELD WITHOUT BAIL BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND THAT MR. WILLIAMS COMMITTED THE OFFENSES HEREIN.
>
> II. THE TRIAL COURT ERRED IN ORDERING MR. WILLIAMS HELD WITHOUT BAIL BECAUSE THERE WAS INSUFFICIENT EVIDENCE THAT MR. WILLIAMS POSED A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM TO ANY PERSON OR THE COMMUNITY.
>
> III. THE TRIAL COURT ERRED IN ORDERING MR. WILLIAMS HELD WITHOUT BAIL BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND THAT NO RELEASE CONDITIONS WOULD REASONABLY ASSURE THE SAFETY OF A PARTICULAR PERSON OR THE COMMUNITY.

## II. Law and Analysis

{¶ 34} In his assignments of error, Williams argues that the trial court erred in denying him bail because the state failed to present clear and convincing evidence that

Williams committed the charged offenses, that he posed a substantial risk of serious physical harm to any person or the community, and that no release conditions would reasonably assure the safety of a person or the community. He contends that the state failed to present sufficient evidence to identify him as the perpetrator of these crimes because the suspect's face cannot be seen in any of the security camera footage, there was no evidence that Williams owned or possessed any firearms, and the state did not present any evidence (beyond Conklin's testimony) regarding ownership of the black Focus seen in the security footage. He also argues that, without sufficient evidence of his identity as one of the perpetrators, his criminal record is insufficient to support the trial court's findings that he poses a substantial risk of serious physical harm to M.S. and that no release conditions would reasonably assure the safety of M.S. and the community.

{¶ 35} The state responds that there was sufficient evidence supporting each of the trial court's findings. It argues that (1) Conklin's testimony regarding the security camera videos, the matching shell casings from the shooting in this case and the June 16 shooting at Williams's house, and evidence of a feud between Williams and a close friend of N.S. and M.S.'s family supports the trial court's finding on the first element of the statute; (2) the injuries to the victims, the shooting happening in an urban area, Williams being on community control at the time, and Williams apparently being motivated by revenge support the court's findings on the second element; and (3) Williams's "unwillingness or inability to abide by law [sic] even while under court

14.

supervision, the vulnerabilities of electronic monitoring * * *[,]" and the apparent feud

between Williams and Sykes support the court's findings on the third element.

## A. Denial of bail

{¶ 36} Under R.C. 2937.222, a trial court may deny bail to a defendant accused of

certain serious felonies, including murder or a first- or second-degree felony, after

holding a hearing and making certain findings. R.C. 2937.222(A), (B). Specifically, the

trial court must find by clear and convincing evidence that (1) "the proof is evident or the

presumption great * * *" that the defendant committed the serious felonies he was

charged with, (2) the defendant "poses a substantial risk of serious physical harm to any

person or to the community, * * *" and (3) "no release conditions will reasonably assure

the safety of that person and the community." R.C. 2937.222(B). Clear and convincing

evidence is more than "a mere 'preponderance of the evidence,' but not to the extent of

such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which

will produce in the mind of the trier of facts a firm belief or conviction as to the facts

sought to be established." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59

N.E.3d 1231, ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954),

paragraph three of the syllabus.

{¶ 37} In deciding whether the defendant poses a substantial risk of serious

physical harm and whether any release conditions can assure safety, the trial court is

required to consider "all available information" about:

15.

(1) The nature and circumstances of the offense charged, including whether the offense is an offense of violence or involves alcohol or a drug of abuse;

(2) The weight of the evidence against the accused;

(3) The history and characteristics of the accused, including, but not limited to, both of the following:

(a) The character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, and criminal history of the accused;

(b) Whether, at the time of the current alleged offense or at the time of the arrest of the accused, the accused was on probation, parole, post-release control, or other release pending trial, sentencing, appeal, or completion of sentence for the commission of an offense under the laws of this state, another state, or the United States or under a municipal ordinance.

(4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

R.C. 2937.222(C).

**{¶ 38}** We review a trial court's order denying bail under R.C. 2937.222 to determine if there was "'sufficient evidence presented by which the [trial] court could have formed a firm belief or conviction in support of its finding[s].'" (Brackets sic.) *State v. Knowles*, 6th Dist. Lucas No. L-22-1040, 2022-Ohio-3264, ¶ 22, quoting *State v. Blackshear*, 6th Dist. Lucas No. L-21-1141, 2022-Ohio-230, ¶ 13; and citing *State v. Brown*, 6th Dist. Erie No. E-06-025, 2006-Ohio-3377, ¶ 25; *see also State v. Sowders*, 1st Dist. Hamilton No. C-220114, 2022-Ohio-2401, ¶ 28 (The standard of review for a trial court's findings under R.C. 2937.222 is whether "the trial court had sufficient evidence before it to satisfy the clear-and-convincing standard.").[2]

**B. The presumption is great that Williams committed the offenses charged.**

**{¶ 39}** In his first assignment of error, Williams argues that the state's evidence was insufficient to prove by clear and convincing evidence that the proof was evident or

---

[2] We recognize that the standard of review in these cases is far from settled among Ohio's appellate districts. *See Blackshear* at ¶ 13-14, citing *State v. Henderson*, 10th Dist. Franklin No. 16AP-870, 2017-Ohio-2678, ¶ 5 (review for an abuse of discretion); *State v. Foster,* 10th Dist. Franklin No. 08AP-523, 2008-Ohio-3525, ¶ 6 (same); *State v. Urso*, 11th Dist. Trumbull No. 2010-T-0042, 2010-Ohio-2151, ¶ 47 (review using a mixed standard of review, similar to motions to suppress); *State v. Mitchell*, 2019-Ohio-2465, 139 N.E.3d 556, ¶ 17 (2d Dist.) (applying all three standards of review and "finding consistent results * * *"); *State v. Hawkins*, 8th Dist. Cuyahoga No. 109097, 2019-Ohio-5132, ¶ 47 (applying all three standards of review and "finding consistent results * * *"); and *State v. Jackson*, 8th Dist. Cuyahoga No. 110621, 2021-Ohio-4320, ¶ 40 (same). Although we reviewed the trial court's decision in *Blackshear* under all three standards of review, *Blackshear* at ¶ 25, we determined in *Knowles* that such extensive inquiry is unnecessary. *Knowles* at ¶ 22.

the presumption great that Williams committed the offenses charged in this case.  We disagree.

{¶ 40} At the hearing, the state presented evidence—in the form of Conklin's testimony—that a person in "a gray hoodie, * * * black shorts [with] a white stripe with a little bit of red going down the side of the shorts, and * * * bright white tennis shoes" walked out of Williams's house and got into a black Ford Focus that was registered to Williams's mother.  Based on the testimony, it seemed unlikely that anyone else was in the car.  The same car drove down Elm Street past Austin—where N.S. and M.S. are seen on the video playing basketball in front of their house—turned around in an alley, drove back past Austin on Elm, paused briefly when it passed Austin to "watch[] the boys playing basketball[,]" then drove around the block to park on Moss Street.  After parking the car on Moss, the same person in a gray hoodie and black shorts gets out of the same black Focus and walks down Elm toward Austin.  Although the person in the gray hoodie goes out of the cameras' views once the suspects get to the corner of Austin and Elm, the second, unidentified suspect is clearly visible on video raising a gun and firing at N.S. and M.S.  Following the shooting, the same person in a gray hoodie parks the same black Focus in front of Williams's house on Mayville and goes back into the house.

{¶ 41} In addition to this testimony about the security videos, Conklin said that his review of map routes from Williams's house to the house on Austin showed an average drive time of three to four minutes, which was consistent with the timestamps on the

18.

videos and the time it took the people who left Mayville to get to and from Austin in the videos. Two days after the August 20 shooting, someone shot at Williams's house. Responding officers saw Williams wearing shorts that Conklin described as the "same shorts as seen in the video from the shooting." They also saw a pair of "bright white tennis shoes" on the floor near where Williams was sitting.

{¶ 42} Conklin also testified that the TPD had matched shell casings from one of the two guns used in the August 20 shooting to shell casings found in front of Williams's house on Mayville in June 2021 after two men from inside the house returned fire when someone outside shot at the house. Although the gun was connected to Williams's home, it was undisputed that Williams was incarcerated at the time of the June 2021 shooting incident. There was also some evidence of a feud between Williams and Sykes, and that Sykes was close to N.S. and M.S.'s family, which was supported by the Crime Stopper tipster who identified Williams as one of the shooters reporting that Williams shot the victims as "retaliation."

{¶ 43} Sufficient evidence to support a trial court's firm belief or conviction of a great presumption of a defendant's guilt exists when the evidence presented, if believed, strongly suggests that the defendant is guilty of the crimes charged. *See State v. Burney*, 10th Dist. Franklin Nos. 14AP-354 and 14AP-356, 2014-Ohio-2622, ¶ 21. A trial court can make reasonable inferences from the evidence presented at the hearing to support its

19.

findings regarding a great presumption of the defendant's guilt. *See Brown*, 6th Dist. Erie No. E-06-025, 2006-Ohio-3377, at ¶ 33.

{¶ 44} Here, if the evidence that Conklin testified to is believed, it strongly suggests that Williams was one of the two men who shot N.S. and M.S. Williams's arguments are all rooted in a claimed lack of evidence identifying him as one of the people involved in the August 20 shooting. However, Conklin's testimony was sufficient to establish Williams's identity, at least circumstantially, by clear and convincing evidence. Thus, we conclude that the trial court had before it sufficient evidence from which it could have formed a firm belief or conviction in support of its findings, i.e., evidence sufficient to satisfy the clear-and-convincing standard. *Knowles*, 6th Dist. Lucas No. L-22-1040, 2022-Ohio-3264, at ¶ 22; *Sowders*, 1st Dist. Hamilton No. C-220114, 2022-Ohio-2401, at ¶ 28.

{¶ 45} Williams's first assignment of error is not well-taken.

### C. Williams poses a substantial risk of serious physical harm to M.S.

{¶ 46} In his second assignment of error, Williams argues that there was not sufficient evidence to support the trial court's findings that he poses a substantial risk of serious physical harm to M.S. We disagree.

{¶ 47} In addition to the testimony outlined in the first assignment of error, Conklin testified that Williams was adjudicated delinquent of rape and aggravated burglary with a firearm when he was 13 years old; less than two months after being

released from serving five years in DYS, and while he was on aftercare, Williams was arrested for drug possession while having a gun on him; Williams was sent to CTF as part of his community control sentence in the drug possession case, and was released from CTF only two days before N.S and M.S. were shot; a month after the shooting, Williams was pulled over, and police found a loaded gun in the car (partially concealed under a passenger's legs) and a baggie of suspected cocaine in Williams's pocket; and a search of Williams's home found four guns.

{¶ 48} Taken together, this testimony shows that Williams not only continues to commit crimes while he is under court-ordered supervision for past offenses, but that he tends to reoffend within a very short period of time after his release from confinement. It also shows that Williams has access to guns. Combined with the evidence that N.S. and M.S. were shot as part of a feud between Williams and Sykes, we find that the trial court had before it sufficient evidence from which it could have formed a firm belief or conviction that M.S. was at a substantial risk of serious physical harm if Williams were granted bail, and the court's decision was supported by evidence sufficient to satisfy the clear-and-convincing standard. *Knowles* at ¶ 22; *Sowders* at ¶ 28.

{¶ 49} Williams's second assignment of error is not well-taken.

## D. No release conditions will reasonably assure
## the safety of M.S. and the community.

{¶ 50} Finally, in his third assignment of error, Williams argues that there was not sufficient evidence to support the trial court's finding that no release conditions would reasonably assure the safety of M.S. and the community. Again, we disagree.

{¶ 51} In addition to his testimony about Williams's apparently short recidivism time, his seemingly easy access to guns, and his apparent feud with Sykes, Conklin testified that Lucas County's electronic monitoring system is not foolproof. Those being monitored can remove their monitoring units, the TPD is not responsible for the electronic monitoring system, the system is not monitored around the clock, the TPD is not notified immediately when someone removes their monitor, and a person who removes their monitor could be out in the community for an extended period of time before the police find out about it.

{¶ 52} Based on this evidence, we find that the trial court had before it sufficient evidence from which it could have formed a firm belief or conviction that no release conditions would reasonably assure the safety of M.S. or the community, and the court's decision was supported by evidence sufficient to satisfy the clear-and-convincing standard. *Knowles* at ¶ 22; *Sowders* at ¶ 28.

{¶ 53} Williams's third assignment of error is not well-taken.

22.

### III. Conclusion

**{¶ 54}** For the foregoing reasons, the January 6, 2022 judgment of the Lucas County Court of Common Pleas is affirmed. Williams is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                          _____
JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, P.J.                        _____
CONCUR.                                           JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.