[Cite as *State v. Torres-Mesa*, 2023-Ohio-4397.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

          Plaintiff-Appellee,            :            No. 23AP-98
                                   (C.P.C. No. 22CR-6172)

v.                                             :

                                   (REGULAR CALENDAR)

Ivan E. Torres-Mesa,                           :

          Defendant-Appellant.           :

D E C I S I O N

Rendered on December 5, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

**On brief:** *Beck Peistrup, LTD*, and *Robert James Beck, Jr.*, for appellant. **Argued:** *Robert James Beck, Jr.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Ivan E. Torres-Mesa, appeals from a decision and entry of the Franklin County Court of Common Pleas ordering Ivan to be held without bond pursuant to R.C. 2937.222. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} On December 30, 2022, plaintiff-appellee, State of Ohio, issued a 39-count indictment charging Ivan and two co-defendants, Raymundo Martinez-Mesa and Jessica L. Delacruz Toscana, with felony drug trafficking, drug possession, and illegal manufacture of drugs. The indictment charged each of the three co-defendants with the same 13 offenses: six counts of trafficking in a fentanyl-related compound, in violation of R.C. 2925.03, first-degree felonies; six counts of possession of a fentanyl-related compound, in violation of R.C. 2925.11, first-degree felonies; and one count of illegal manufacture of drugs, in

violation of R.C. 2925.04, a second-degree felony. Each of the possession and trafficking charges contained accompanying firearm specifications and six of those counts additionally contained accompanying major drug offender specifications.

{¶ 3} Prior to Ivan's arraignment, the state filed a motion to hold Ivan without bail or bond pursuant to R.C. 2937.222. The trial court then conducted Ivan's arraignment on January 6, 2023, during which Ivan entered a plea of not guilty to all 13 counts. The trial court ordered Ivan held without bail pending a hearing on the state's motion to hold Ivan without bail or bond.

{¶ 4} On January 12, 2023, the trial court held a combined denial of bail or bond hearing for Ivan, Jessica, and Raymundo. At the hearing, James Walker, a detective with the Columbus Division of Police assigned to the Organized Crime Investigation Task Force, testified he began investigating an individual named A.S. in June 2022 on suspicion of being a mid-level drug trafficker. Through physical and electronic surveillance of A.S., Detective Walker identified Raymundo, Jessica, and Ivan as persons of interest. In July 2022, officers observed A.S. conduct a meeting with Raymundo who, at the time, was operating a 2003 red Ford pickup truck.

{¶ 5} Surveillance of the red pickup truck with Raymundo in the driver's seat led detectives to a house at Flint Creek in Dublin where Raymundo parked the truck inside the garage. Detectives learned that Raymundo lived at the Flint Creek residence with Jessica, his girlfriend. Through their surveillance, detectives observed an individual make multiple trips to another residence at Laurel Pine in Dublin.[1] Detectives determined Ivan lived at the Laurel Pine residence with another man, E.G.

{¶ 6} Further surveillance of both the Flint Creek and the Laurel Pine residences revealed additional vehicles that Detective Walker testified were used by Raymundo, Ivan, and Jessica: a gray Honda Civic, a GMC Z71, and a newer-model Ford F-150. Detectives affixed GPS tracking units to those vehicles and learned that the red older-model F-150 truck had made trips to Mexico, then California, and then back to Columbus. Detectives eventually removed the GPS tracking units for fear the units would be detected or

[1] When Detective Walker first testifies about the second residence in Dublin, he states the address as "Flint Creek." (Tr. at 15.) Detective Walker's subsequent testimony in the record refers to the second residence being located on Laurel Pine, indicating Detective Walker misspoke when he first stated the address of the second Dublin residence.

compromised. Additionally, detectives ceased their physical surveillance of the Flint Creek and Laurel Pine residences.

{¶ 7} Although detectives had ceased their surveillance of the residences, they entered the older-model F-150 into a national deconfliction database that logs and tracks information on investigations occurring throughout the country. The database yielded a "deconfliction hit" for the red older-model F-150 in which Utah police officers reported they had stopped, searched, and seized the truck and recovered 49 kilograms of cocaine from "surreptitious containers" inside the truck. (Tr. at 19-20.) Detective Walker testified that E.G., the man detectives believed was living with Ivan, was driving the truck in Utah when it was stopped.

{¶ 8} Following the deconfliction hit, detectives attempted to resume their physical surveillance of the Flint Creek and Laurel Pine residences. However, when detectives returned in July 2022, the three co-defendants no longer occupied either of these residences.

{¶ 9} Detective Walker testified the surveillance operation then switched to physical surveillance of wire-remitting locations in Columbus. This approach led to detectives observing Jessica driving the same Honda Civic previously associated with the group. Detectives followed Jessica to an apartment located at Rosslare Harbour Drive and subsequently observed both Raymundo and Ivan at that location. Detective Walker testified that Jessica, Raymundo, and Ivan were all living together at the Rosslare Harbour location. In mid-December 2022, detectives then resumed GPS surveillance of the vehicles associated with the three co-defendants: the newer-model Ford F-150, a gray Honda Civic, and a gray Honda Accord.

{¶ 10} The physical and electronic surveillance led detectives to a self-storage facility in Fairfield County. Detectives observed Ivan driving the Honda Civic to the storage facility, and the GPS location indicated the vehicle was stopped "for a period of minutes" in front of Unit 4281. (Tr. at 24.) On different days of surveillance, Detective Walker said officers observed Jessica and Ivan going into Unit 5021, which Detective Walker described as a "shield unit" used to store legitimate items. (Tr. at 24.) Subsequently, Detective Walker said his team observed Jessica and Raymundo's vehicle parked in front of Unit 4281. Video

surveillance then showed Raymundo exiting the unit and appearing to lock it. Detectives determined Jessica was paying for both storage units.

{¶ 11} On September 20, 2022, Detective Walker obtained search warrants for both storage units and for the Rosslare Harbour apartment. Inside Unit 5021, officers found one rifle. Inside Unit 4281, officers found 18 kilograms of fentanyl, approximately 20,000 compressed fentanyl pills, and "numerous" assault-style rifles and large high-capacity magazines and ammunition. (Tr. at 26.) Officers also found magazines that could not be matched to the firearms inside the storage units. The total value of the amount of drugs seized from the storage unit was "well into the tens of millions of dollars." (Tr. at 34.) Additionally, Unit 4281 contained two jet skis that officers later learned were used to store and traffic bulk narcotics. Detective Walker said those jet skis had previously been observed at the Laurel Pine residence. Detectives also collected numerous cell phones wrapped in tinfoil from Unit 4281.

{¶ 12} The search of the Rosslare Harbour apartment yielded "numerous fraudulent documents," including passports and identification cards. (Tr. at 29.) These fraudulent documents contained pictures of Jessica, Raymundo, and Ivan but used different names for each of them. Detectives also recovered "numerous firearms" from what they believed to be Jessica and Raymundo's room, and they collected additional cell phones and documents related to the red older-model truck seized in Utah from this residence. (Tr. at 29.)

{¶ 13} Subsequent examination of the cell phones officers recovered from execution of the search warrant revealed "numerous videos and photos" that Detective Walker testified showed Jessica, Raymundo, and Ivan "either facilitating bulk -- or drug deals with bulk quantities of narcotics, in addition to videos displaying the counting of bulk narcotics." (Tr. at 31.) Detective Walker testified 28 phones were recovered from the investigation and, at the time of the bond hearing, officers had been able to go through 24 of the phones. Of those 24 phones, Detective Walker said 15 of the phones contain "some sort of nexus to drug trafficking or smuggling," and he further testified that through these 15 phones, there was evidence connecting all three of the co-defendants to drug trafficking. (Tr. at 32.) Officers were also able to use the phones to learn how money would be remitted to the

Sinaloa area of Mexico, and detectives gathered intelligence indicating Jessica was a member or an associate of the Sinaloa cartel.

{¶ 14} Detective Walker further testified the different colors of the pills and powders recovered in the storage unit can correlate to manufactures coloring their pills in a way to mimic a legitimate prescription narcotic pill.  He further testified the cell phone videos revealed an "alarming number" of firearms that the three co-defendants used that were not recovered in the storage units and that detectives believe are still in Franklin County.  (Tr. at 38.)  Detective Walker described the types of weapons seen in the content from the seized cell phones, stating "there are handguns with Glock switches -- this is a switch in order to make it a fully automatic handgun -- in addition to short-barrel rifles, 40-millimeter grenade launchers, in addition to RPG weapons systems." (Tr. at 38.)  Based on the amount of currency Detective Walker saw moving on the cell phones, he testified he "[a]bsolutely" had reason to believe the three co-defendants have access to additional currency that could facilitate flight from the United States if they were released on bond.  (Tr. at 41.)

{¶ 15} At the conclusion of the hearing, the trial court denied Ivan, Jessica, and Raymundo bail while awaiting trial pursuant to R.C. 2937.222.  Specifically, the trial court found the state had demonstrated, by clear and convincing evidence, that the proof is evident or the presumption great that the three accused committed at least some of the offenses, that all three co-defendants pose a danger to the community, and that no release conditions would reasonably assure the safety of the public from the danger posed by Ivan, Jessica, and Raymundo if they were released on bond.  The trial court journalized its decision in a January 13, 2023 decision and entry.  Ivan timely appeals.

## II. Assignment of Error

{¶ 16}  Ivan assigns the following sole assignment of error for our review:

The trial court did err by ordering [Ivan] held without bond.

## III. Discussion

{¶ 17} In his sole assignment of error, Ivan argues the trial court erred when it ordered him to be held without bond while awaiting trial.  More specifically, Ivan asserts there was not clear and convincing evidence in the record to support the trial court's determination that, pursuant to R.C. 2937.222, Ivan is not entitled to bail or bond.

{¶ 18} An appellate court reviews a trial court's decision on a denial of bail pursuant to R.C. 2937.222 for an abuse of discretion. *State v. Justice*, 10th Dist. No. 22AP-234, 2023-Ohio-435, ¶ 11, citing *State v. De La Cruz*, 10th Dist. No. 21AP-516, 2022-Ohio-4293, ¶ 10, citing *State v. Henderson*, 10th Dist. No. 16AP-870, 2017-Ohio-2678, ¶ 5. *See also State v. Foster*, 10th Dist. No. 08AP-523, 2008-Ohio-3525, ¶ 6 ("the trial court's order [denying bail under R.C. 2937.222] will not be reversed absent a showing that the trial court abused its discretion in finding that the prosecution had met its burden of proof to show that appellant should be denied bail").[2] An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Additionally, an appellate court may find an abuse of discretion where the trial court " 'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.' " *Vacheresse v. Paulchel*, 10th Dist. No. 22AP-583, 2023-Ohio-3226, ¶ 17, quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.).

{¶ 19} Here, the state moved to hold Ivan without bail or bond. Pursuant to R.C. 2937.222(A), on motion of the state or by its own initiative, a trial court must hold a hearing to determine whether an accused person charged with certain felony offenses, including first- and second-degree felony offenses, shall be denied bail. The trial court may not deny the accused bail unless the trial court finds, by clear and convincing evidence, that: (1) "the proof is evident or the presumption great that the accused committed the offense," (2) "the accused poses a substantial risk of serious physical harm to any person or to the community," and (3) "no release conditions will reasonably assure the safety of that person and the community." R.C. 2937.222(B). The state bears the burden of proving the statutory conditions for a denial of bail. R.C. 2937.222(A). "Clear and convincing evidence is that 'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Foster* at ¶ 6, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

---

[2] We recognize, as this court did in *De La Cruz*, that Ohio's appellate districts are divided on the proper standard of review of a trial court's denial of bail under R.C. 2937.222, but based on the principles of stare decisis we will continue to apply the abuse of discretion standard. *Id*. at ¶ 5, fn. 6, citing *State v. Sowders*, 1st Dist. No. C-220114, 2022-Ohio-2401, ¶ 22-25 (examining standards of review applied by various appellate courts).

{¶ 20} Ivan argues the state failed to demonstrate, by clear and convincing evidence, any of the three statutory conditions to deny him bail. Thus, we will examine the evidence presented relative to each of the three statutory conditions for a denial of bail under R.C. 2937.222(B).

**A. Proof Evident or Presumption Great that Accused Committed the Offense**

{¶ 21} The first condition the state must demonstrate for a denial of bail is that the proof is evident or the presumption great that the accused committed the offense. R.C. 2937.222(B). Ivan acknowledges that law enforcement recovered a substantial amount of drugs when it executed the search warrants. He asserts, however, that while the state may have put forth clear and convincing evidence of his co-defendants' involvement in the offenses, the state failed to present enough evidence that Ivan, specifically, had any access to the drugs seized in the execution of the search warrant such that the proof is evident or the presumption great that he committed the offenses. We disagree.

{¶ 22} At the hearing, Detective Walker testified regarding the extensive investigation into all three of the co-defendants and to Ivan's involvement in particular. Specific to Ivan, Detective Walker testified that Ivan lived at the Rosslare Harbour apartment with Jessica and Raymundo at the time police executed the search warrants, stating, in response to a direct question about whether Ivan lived with Jessica at that time, that "all three lived together." (Tr. at 64.) Inside the Rosslare Harbour apartment, law enforcement recovered fraudulent documents, including passports and identification cards, and Detective Walker testified some of those documents had Ivan's picture paired with a falsified name. Detective Walker further testified that detectives observed Ivan driving the Honda Civic to the storage facility and that GPS data indicated the vehicle Ivan drove was stopped "for a period of minutes" in front of Unit 4281. (Tr. at 24.) The search of Unit 4281 yielded the bulk quantities of drugs worth "well into the tens of millions of dollars," the assault-style weapons, and high-capacity magazines and ammunition, only some of which could be matched to the weapons found within the storage unit. (Tr. at 34.) Additionally, Unit 4281 contained two jet skis used to store and traffic bulk narcotics that Detective Walker testified detectives had previously observed at Ivan's prior residence on Laurel Pine.

{¶ 23} Further, Detective Walker testified that 15 of the cell phones recovered from both the storage unit and the Rosslare Harbour apartment contained "some sort of nexus to drug trafficking or smuggling," and he specifically testified the cell phones contained "numerous videos and photos" showing Ivan and his co-defendants "either facilitating bulk -- or drug deals with bulk quantities of narcotics, in addition to videos displaying the counting of bulk narcotics." (Tr. at 31-32.) While the state did not play the surveillance videos or the cell phone videos during the hearing, Detective Walker described the contents of those videos, and there is no indication the trial court did not believe Detective Walker's testimony. *See, e.g.*, *State v. Greenawalt*, 3d Dist. No. 9-22-43, 2023-Ohio-50, ¶ 18 (testimony at the denial of bail hearing from two detectives was sufficient to establish clear and convincing evidence related to the first factor of R.C. 2937.222(B), including the detectives' testimony about *the existence* of surveillance video footage of the appellant); *State v. Williams*, 6th Dist. No. L-22-1012, 2022-Ohio-3858, ¶ 8, fn. 1, ¶ 44 (the trial court had clear and convincing evidence to find that the proof is evident or the presumption great that the accused committed the offenses where the state could not play a surveillance video used in the police investigation during the hearing due to technical difficulties but the state had the detective "describe what was in the videos for the court"); R.C. 2937.222(A) (the rules of evidence "do not apply to the presentation and consideration of information at the [denial of bail] hearing").

{¶ 24} Based on this evidence, the trial court did not abuse its discretion in finding that the state established by clear and convincing evidence that the proof is evident or the presumption great that Ivan committed the offenses. *See State v. Burney*, 10th Dist. No. 14AP-354, 2014-Ohio-2622, ¶ 21 (even where evidence of an accused's involvement is circumstantial, such evidence, if believed, can still constitute clear and convincing evidence to support the trial court's conclusion on denial of bail).

**B. Substantial Risk of Serious Physical Harm**

{¶ 25} The second statutory condition requires the trial court to determine whether the accused poses a substantial risk of serious physical harm to a specific person or the community. In making a determination of this second factor, the statute directs what the court must consider:

(C) The judge, in determining whether the accused person described in [R.C. 2937.222(A)] poses a substantial risk of serious physical harm to any person or to the community and whether there are conditions of release that will reasonably assure the safety of that person and the community, shall consider all available information regarding all of the following:

(1) The nature and circumstances of the offense charged, including whether the offense is an offense of violence or involves alcohol or a drug of abuse;

(2) The weight of the evidence against the accused;

(3) The history and characteristics of the accused, including, but not limited to, both of the following:

(a) The character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, and criminal history of the accused;

(b) Whether, at the time of the current alleged offense or at the time of the arrest of the accused, the accused was on probation, parole, post-release control, or other release pending trial, sentencing, appeal, or completion of sentence for the commission of an offense under the laws of this state, another state, or the United States or under a municipal ordinance.

(4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

R.C. 2937.222.

{¶ 26} Detective Walker testified about the quantity of drugs seized in the storage unit, with a value in the tens of millions of dollars, and the cell phone videos showing both drug trafficking behavior as well as the "alarming number" of firearms believed to still be in Franklin County that were not recovered by Detective Walker's task force in the execution of the search warrant. (Tr. at 38.) Detective Walker described the types of weapons seen in the content from the seized cell phones, stating "there are handguns with Glock switches -- this is a switch in order to make it a fully automatic handgun -- in addition to short-barrel rifles, 40-millimeter grenade launchers, in addition to RPG weapons

systems." (Tr. at 38.) This testimony about the scale of the drug trafficking operation and the quantity and type of weapons law enforcement officers did not recover is sufficient to establish, by clear and convincing evidence, that Ivan posed a substantial risk of serious physical harm to the community. Thus, the trial court did not abuse its discretion in finding the second statutory condition for a denial of bail.

## C. No Release Conditions Will Assure the Safety of the Community

{¶ 27} The third and final statutory condition for the denial of bail is whether there are any conditions of release that will reasonably assure the safety of the community. As noted above, R.C. 2937.222(C) specifies what information the trial court must consider in evaluating the third factor.

{¶ 28} Relative to the third factor, Detective Walker testified that the cell phones contained information demonstrating the co-defendants were remitting money to the Sinaloa area of Mexico, and he further testified about the existence of the Sinaloa drug cartel and Jessica's known ties to the organization. Based on the amount of currency Detective Walker saw moving on the cell phones, he testified he "[a]bsolutely" had reason to believe that all three co-defendants, including Ivan, have access to additional currency that could facilitate flight from the United States if they were released on bond. (Tr. at 41.) Even with this testimony, however, the trial court was explicit that it was not basing its denial of bail decision based on Ivan's risk of flight. Instead, the trial court explained it was considering the statutory factors to determine whether any conditions of release could reasonably assure the safety of the community.

{¶ 29} In considering the safety of the community, the trial court noted the number and type of weapons constituting the "arsenal" found both in the residence and in the storage units. (Tr. at 88.) The trial court determined that these weapons, the unaccounted-for magazines, and Glock switches indicated that no release conditions, including any GPS monitoring, could reasonably assure the safety of the community. Based on this record, we find the trial court did not abuse its discretion in determining clear and convincing evidence established the third statutory factor for a denial of bail. *See De La Cruz* at ¶ 19-21.

**D. Conclusion**

{¶ 30} Having reviewed the evidence presented at the bond hearing, we find the trial court did not abuse its discretion in determining the state had established by clear and convincing evidence that the proof is evident or the presumption great that Ivan committed the offenses, that Ivan posed a substantial risk of serious physical harm to the community, and that no release conditions would reasonably assure the safety of the community. Accordingly, the trial court did not abuse its discretion in ordering Ivan held without bond. We overrule Ivan's sole assignment of error.

**IV. Disposition**

{¶ 31} Based on the foregoing reasons, the trial court did not abuse its discretion in ordering Ivan to be held without bond pursuant to R.C. 2937.222. Having overruled Ivan's sole assignment of error, we affirm the decision and entry of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LELAND, J., concurs.
EDELSTEIN, J., dissents.

_____

EDELSTEIN, J., dissenting.

{¶ 32} I believe both the majority opinion and the trial court make the same mistake in finding that general, non-specific evidence presented—largely without distinction— about all three defendants at a single, combined denial-of-bail hearing is sufficient to deny Ivan bail under R.C. 2937.222. Because R.C. 2937.222 only permits a trial court to deny a defendant pre-trial bail if it finds the state presented clear and convincing evidence of all three statutorily required conditions about that ***particular*** defendant, I find the majority's analysis—much like the trial court's—to be contrary to the governing law. Accordingly, I respectfully dissent.

{¶ 33} The majority accurately recognizes that, under R.C. 2937.222, a trial court cannot deny bail to a person awaiting trial unless it finds the state established, by clear and convincing evidence, all three of the following conditions:

1. "[T]he proof is evident or the presumption great" that the accused committed the serious felonies with which he is charged.

2. The accused "poses a substantial risk of serious physical harm to any person or to the community."

3. "[N]o release conditions will reasonably assure the safety of that person and the community."

R.C. 2937.222(B). (*See* Majority at ¶ 19.) And, indeed, it is important to emphasize that a criminal defendant's general right to reasonable pre-trial bail is secured by both the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution. *See DuBose v. McGuffey*, 168 Ohio St.3d 1, 2022-Ohio-8, ¶ 12.

{¶ 34} It is canonical that "[w]e are * * * duty bound to apply the laws as they are written." *State v. Kennedy*, 10th Dist. No. 22AP-534, 2023-Ohio-3078, ¶ 34. *See also State v. Bortree*, 170 Ohio St.3d 310, 2022-Ohio-3890, ¶ 20, quoting *State ex rel. Tritt v. State Emp. Relations Bd.*, 97 Ohio St.3d 280, 2002-Ohio-6437, ¶ 17. Yet, I do not believe the majority or trial court fully adhere to that fundamental principle when correlating the evidence presented at the combined hearing for all three defendants to the statutory denial-of-bail conditions that needed to be proven about Ivan ***individually***.

{¶ 35} On review, it appears the precipice for such error was the decision to conduct a single, combined denial-of-bail hearing for all three defendants and the manner in which the sole witness's testimony was presented. Certainly, efficiency considerations undoubtedly informed that decision, but I believe the efficacy of the state's evidence ultimately suffered because of that choice in this case. Detective Walker testified about the collective group and described the generalized harm associated with illegal drugs (fentanyl) and firearms. On the whole, his factual testimony about the codefendants was broad, vague, and unclear, making it difficult to ascertain which portions related to each particular codefendant. It is true that some of Detective Walker's testimony about Jessica and Raymundo specifically connected them to the charged offenses or otherwise acted as evidence supporting the state's denial-of-bail request. But his testimony about Ivan's conduct—individually or specifically—is notably wanting on these matters.

{¶ 36} Expectedly, then, the trial court's denial-of-bail analysis was likewise general and non-specific to any of the three codefendants. And now, on appeal, I believe the majority engages in an analysis that equally lacks the discernment that is required.

## I. Evident Proof or Great Presumption of Guilt

{¶ 37} Ivan was charged with the unlawful possession, trafficking, and manufacture of drugs. In support of R.C. 2937.222(B)'s first condition—whether "the proof is evident or the presumption great that the accused committed" the charged offense(s)—the state presented testimony from Detective Walker about the approximately six-month investigation into Ivan, Jessica, and Raymundo he and five other detectives conducted. (*See* Tr. at 48-49, 55.) His testimony clearly and convincingly established that the three defendants knew and interacted with each other. (*See*, *e.g.*, Tr. at 14-16, 21-23.) But none were charged with violating Ohio's conspiracy or organized crime laws in their respective cases below. Thus, proof of their ***connection*** to each other has little bearing on the state's burden to show evident proof or a great presumption that Ivan committed the drug trafficking, possession, and illegal manufacture offenses with which he is charged.

{¶ 38} At the hearing, the trial prosecutor posited that Detective Walker's testimony clearly and convincingly "explained how each of ***these defendants*** are connected to the drugs that were found and a continuing course of conduct from the apartment that they were all sharing here in Franklin County, Ohio, back and forth between here and the storage units in Fairfield County." (Emphasis added.) (Tr. at 72.) And the trial court ultimately concluded that the state proved, by clear and convincing evidence, that "these ***three accused*** committed at least some of the offenses at issue in the indictment * * * if not trafficking, possession." (Emphasis added.) (Tr. at 82-83.)

{¶ 39} But Detective Walker's testimony did not specifically describe any conduct by Ivan that was criminal. Detective Walker acknowledged the task force never conducted a controlled buy with Ivan and did not claim the detectives ever observed Ivan sell, manufacture, or possess drugs. (*See* Tr. at 45.) Furthermore, Detective Walker conceded the task force did not locate any stash or prep house(s) used by the defendants or otherwise connected to the charged drug offenses. (Tr. at 55. *See also* Tr. at 40, 67.) Nor did he claim to know when, how, or by whom the seized drugs were placed in the storage unit where they were recovered. (Tr. at 53.)

{¶ 40} In the absence of any direct evidence that Ivan possessed, trafficked, or manufactured drugs, then, proof that he committed the charged offenses is commensurate with the state's ability to connect Ivan with the evidence collected by detectives from their search of two storage units—Unit 4281 and Unit 5021—and the Rosslare Harbour residence. As the majority notes, Unit 5021 was "described as a 'shield unit' used to store legitimate items." (Majority at ¶ 10, citing Tr. at 24.) Indeed, barring one rifle, all contraband and other items of evidentiary value—drugs, firearms, ammunition, and cell phones wrapped in tinfoil—were recovered from Unit 4281. (*See* Tr. at 25-30.) Law enforcement also seized fraudulent documents, more firearms, and other incriminating evidence from the Rosslare Harbour residence. (*See* Tr. at 29-30.)

{¶ 41} Detective Walker's hearing testimony specifically connected Jessica and Raymundo to both of the storage units. He described surveillance that showed Jessica and Raymundo entering Unit 5021 "on different days" and their vehicle parked in front of Unit 4281. (Tr. at 24.) He also described video surveillance footage that captured Raymundo "exiting [Unit 4281] and then closing it and appearing to lock it." (Tr. at 24.) In addition to testifying about Jessica and Raymundo accessing these two units, Detective Walker indicated detectives also located a card linking Jessica to both storage units in her purse when they searched the Rosslare Harbour residence (Tr. at 29) and later determined that Jessica had been paying for both units (Tr. at 24-25).

{¶ 42} In stark contrast, no evidence suggested either of the storage units were leased to, paid for, or accessed by Ivan. (*See* Tr. at 23-26, 55.) At most, Detective Walker's hearing testimony established that Ivan was observed driving the Honda Civic to the storage unit facility's premises. (*See* Tr. at 23-24.) The majority describes Detective Walker as testifying about observing "Ivan driving the Honda Civic to the storage facility, and the GPS location indicat[ing] the vehicle was stopped 'for a period of minutes' in front of Unit 4281." (Majority at ¶ 10, quoting Tr. at 24. *See also* Majority at ¶ 22, citing Tr. at 24.) But that description is not clearly supported by the testimony on which the majority relies. At the hearing, Detective Walker explained that detectives "discovered the storage units" when, during the course of their physical surveillance at the Rosslare Harbour residence, they observed Ivan operate the Honda Civic and used surveillance (physical and electronic)

to track him to the storage unit facility.  (*See* Tr. at 23.)  The following testimony was elicited as to the particular storage units:

| [Prosecutor]: | Did you observe a continuing action of **the defendants** going from Franklin County into Fairfield County and back? |
|---|---|
| [Det. Walker]: | Yes. |
| [Prosecutor]: | And was that from both physical surveillance and GPS surveillance? |
| [Det. Walker]: | Yes. |
| [Prosecutor]: | Okay. So you told us that you observed Ivan going [to the storage unit facility]. **Did you also observe Raymundo and [Jessica] going to those storage units, as well?** |
| [Det. Walker]: | So we observed the GPS location had stopped right in front of Unit 4281 **for a period of minutes**. Further, on different days of surveillance, video-based surveillance, in addition to physical-based surveillance, [we] observed [Jessica] and [Raymundo] going in Unit 5021 * * *. |
| | And then from there we observed their vehicle park in front of Unit 4281. * * *. |

(Emphasis added.)  (Tr. at 23-24.)  Of note, detectives installed GPS tracking units on at least three vehicles affiliated with the group, including the Honda Civic.  (Tr. at 22-23.)  But in the portion of the testimony cited by the majority, Detective Walker did not specify which vehicle he observed stop in front of Unit 4281, much less that Ivan was the driver at that time. (*See* Tr. at 23-24.)  Even assuming it was the Honda Civic, I do not believe it is appropriate to infer Ivan was the driver since Detective Walker did not explicitly and clearly testify that he was, and Detective Walker's testimony indicated that Jessica was historically known to operate that vehicle.  (*See*, *e.g.*, Tr. at 21-24.)

{¶ 43} Furthermore, Detective Walker conceded the detectives did not know who placed or accessed the drugs, guns, or any other items in the storage units from which they

were recovered. (*See* Tr. at 53.) It is true, as the majority notes, that Detective Walker testified about recovering from "the storage units" two jet skis that "were utilized to store and traffic bulk narcotics." (Majority at ¶ 11. *See* Tr. at 26-27.) And it is true Detective Walker testified that these were the same two jet skis detectives previously observed at the Laurel Pine Lane residence where Ivan, E.G. (who was driving the red truck when it was stopped in Utah), and others lived. (*Id. See also* Majority at ¶ 7; Tr. at 15, 18-20.) But, Detective Walker did not indicate which storage unit these jet skis were in, how they got there, who owned them, who purchased them, or who used them. (*See* Tr. at 26-27.) Nor did he claim Ivan was ever seen interacting with the two jet skis. Thus, I do not believe the record before this court is sufficient to connect Ivan to the recovered jet skis.

{¶ 44} Evidence connecting Ivan to the Rosslare Harbour residence is equally scant. At the denial-of-bail hearing, Detective Walker initially testified about ***observing*** Ivan at the Rosslare Harbour apartment and described only Jessica and Raymundo as ***residing*** at that address. (*See* Tr. at 22, 29.) Although Detective Walker later claimed on redirect examination that "all three lived together" at the time the search warrants were executed, he provided no information regarding the factual basis for that belief. (*See* Tr. at 64.)

{¶ 45} Notable in that regard is Detective Walker's testimony about seizing "numerous firearms from what [detectives] believed to be Raymundo Mesa and Jessica Toscano's room[]" at the Rosslare Harbour apartment. (Tr. at 29.) But, he did not testify about any items recovered from "Ivan's room" or, for that matter, suggest that Ivan had a room or any personal effects at the residence. Detective Walker also did not claim that Ivan's name was on the lease for the apartment or that he paid any rent to live there. Thus, without more, I think it is difficult to conclude Ivan lived at the Rosslare Harbour residence. But, even assuming he did, no drugs were recovered from that location anyway.

{¶ 46} In a similar vein, Detective Walker testified that detectives recovered "numerous fraudulent documents," including passports and identification cards, when they searched the Rosslare Harbour residence. (Tr. at 29.) In its analysis of the first denial-of-bail condition, the majority notes that "Detective Walker testified some of those documents had Ivan's picture paired with a falsified name." (Majority at ¶ 22. *See also id*. at ¶ 12.) The significance of that testimony is unclear, though, because the majority opinion does not connect the evidence presented about fraudulent identification document(s) with Ivan's

face to the drug offenses with which Ivan was charged. *See* R.C. 2937.222(B). And, in fact, because the trial prosecutor did not ask Detective Walker to explain how, based on his experience and knowledge, fraudulent identification documents can be relevant evidence of drug crimes, the record before this court does not contain ***any*** evidentiary basis to make that connection. (*Compare* Tr. at 35-37, 40.)

{¶ 47} Moreover, since Detective Walker's description of the seized fraudulent documents was vague, general, and largely non-specific (at least as to Ivan), I see no basis to presume that more than one of the documents seized from the Rosslare Harbour residence contained Ivan's face. (*See* Tr. at 29-31. *Compare* Majority at ¶ 12.) Indeed, while Detective Walker specifically testified about Jessica and Raymundo having altered passports that appeared legitimate (Tr. at 39), he gave no indication as to the quantity, quality, or type of "fraudulent IDs and documents" detectives seized that pertained to Ivan (*see* Tr. at 29-31, 39-40). And, although Detective Walker also described "***information*** from the [seized] phones" indicating "that Ivan has numerous fake IDs or fictitious ID[s]," Detective Walker did not explain exactly what that "information" was—e.g., photographs of or messages concerning Ivan's false identification documents. (Emphasis added.) (Tr. at 39-40.)

{¶ 48} Based on my review of the record, I do not see a tenable way to view Detective Walker's testimony about any fraudulent documents pertaining to Ivan—seized from the Rosslare Harbour residence or suggested by content on the cell phones—as having any appreciable evidentiary value on whether "the proof is evident or the presumption great that" Ivan committed the drug offenses with which he is charged. *See* R.C. 2937.222(B).

{¶ 49} The majority also relies on Detective Walker's testimony about the evidence subsequently discovered on 15 of the 28 phones recovered from Unit 4281 and the Rosslare Harbour residence in its analysis. (Majority at ¶ 23, citing Tr. at 31-32. *See also* Majority at ¶ 13-14.) More precisely, Detective Walker testified that these 15 phones "contain[ed] some sort of nexus to drug trafficking or smuggling" (Tr. at 32) and "a small insight into their complex network of money laundering" (Tr. at 32-33). It is true that Detective Walker answered in the affirmative when the trial prosecutor asked if he saw "evidence of all three defendants throughout those phones [related to drug trafficking]." (Tr. at 32.) But Detective Walker provided no specific information about any content on the phones that

could be connected to Ivan in particular.  Indeed, Detective Walker did not describe Ivan's actions or statements in any of the extracted media items or messages found on any of those 15 phones, when any such content was created or sent, the type(s) of drugs observed in content concerning Ivan, or whether the Ivan-specific content even related to the offenses charged in this case.  (*Compare* Tr. at 32) (describing cell phone content depicting "[Raymundo] and others having conversations into educating their customers on how to manufacture or cut fentanyl and just on drug trafficking").

{¶ 50}  Clearly connecting Ivan with any drug trafficking, possession, and/or manufacturing content extracted from the seized phones is difficult because Detective Walker gave sweeping and vague descriptions about that content and generally attributed all of it to the collective group.  (*See* Tr. at 31-33.)  Nonetheless, the majority notes that Detective Walker broadly described " 'numerous videos and photos' showing Ivan and his co-defendants 'either facilitating bulk -- or drug deals with bulk quantities of narcotics, in addition to videos displaying the counting of bulk narcotics.' " (*See* Majority at ¶ 23, quoting Tr. at 31-32.)  But none of these videos or photographs were presented as evidence at the denial-of-bail hearing, or even described in any appreciable defendant-specific detail.

{¶ 51}  While I generally agree with the proposition that the testimony about the *existence* of these media items could be sufficient to establish clear and convincing evidence related to the first factor (*see* Majority at ¶ 23), I do not agree with the majority's finding that Detective Walker's testimony was sufficient in this instance.  Further, the two cases on which the majority decision relies are largely inapposite because neither involved a single, combined denial-of-bail hearing for multiple defendants.  (*Compare* Majority at ¶ 23, citing *State v. Greenawalt*, 3d Dist. No. 9-22-43, 2023-Ohio-50, ¶ 18, and *State v. Williams*, 6th Dist. No. L-22-1012, 2022-Ohio-3858, ¶ 8, fn. 1, ¶ 44.)

{¶ 52}  Indeed, the issue is not the **veracity** of Detective Walker's testimony about the contents of the phones—which I assume to be true.  (*See* Majority at ¶ 23) (noting "there is no indication the trial court did not believe Detective Walker's testimony").  It is, instead, both the **overbreadth** and **non-specificity** of his descriptions about the relevant items extracted from the phones on which the state, the trial court, and now the majority rely to conclude there is "clear and convincing evidence that the proof is evident or the presumption great" that Ivan committed the charged offenses.  For instance, facilitating

bulk drug deals and counting bulk narcotics are two separate activities.  And Detective Walker did not specify the type of narcotics observed in connection to either activity, much less give any specifics as to when these media items were created or what exactly was depicted.  (*See* Tr. at 31-32.)  This is significant because all of Ivan's drug charges pertain to the trafficking, possession, and manufacture of fentanyl.  So, for example, if the phones depicted Ivan counting bulk quantities of some other type of narcotic over ten years ago—where the statute of limitations for all drug-related felony charges is six years, subject to tolling, *see* R.C. 2901.13(A)(1)(a)—then such evidence would be insufficient to satisfy the first condition of R.C. 2937.222.

{¶ 53} When the trial court analyzed R.C. 2937.222(B)'s first condition—evident proof or great presumption of guilt—it did not parse out the relevant testimony as it related to each defendant individually.  Instead, the trial court considered the testimony presented about the group, collectively, and found, without distinction, that it clearly and convincingly established each defendant committed some of the charged offenses.  (Tr. at 82-85.)  The majority opinion's analysis similarly lacks the circumspection I believe both the Ohio Constitution and the denial-of-bail statute require.  Concluding otherwise undermines the plain language of the statute and the bedrock principles of our criminal justice system.

{¶ 54} Because the trial court held a single denial-of-bail hearing for three defendants and the state's sole witness testified generally about the actions of the collective group with little particularity as to Ivan's involvement, I do not believe the trial court judge was in the position to—nor did he—adequately segregate the evidence applicable to Ivan and separately consider whether that evidence clearly and convincingly established that "the proof is evident or the presumption is great" that Ivan committed the offenses with which he was charged.  In light of my concerns about the spill-over effect caused by the process below and based on my review of the record, I would conclude that, under the facts and circumstances of this case, the trial court's conclusion as to the first condition did not comply with the dictates of R.C. 2937.222(B).

{¶ 55} Even assuming, as the majority contends, the evidence was sufficient as to the first factor, however, I would still find that the trial court's decision to deny Ivan pre-trial bail was nonetheless contrary to law.  This is because, as described below, the trial court failed to properly consider whether Detective Walker's hearing testimony clearly and

convincingly established that *Ivan* posed a substantial risk of serious physical harm to the community and, if so, whether any release conditions could reasonably assure the community's safety.

## II.  Substantial Risk of Serious Physical Harm to the Community

{¶ 56} In support of R.C. 2937.222(B)'s second condition—whether each defendant posed a "substantial risk of serious physical harm to any person or to the community"—the trial prosecutor elicited testimony from Detective Walker describing the general danger posed by the unlawful use of fentanyl (particularly in the form of pills manufactured by drug traffickers) and firearms.  (*See* Tr. at 35-38.)  In closing arguments, the trial prosecutor broadly noted that drug trafficking and dealing "often result[] in firearm offenses" and contended that "*these defendants* certainly have the means to access those types of firearms that are, quite frankly, killing this community, along with the drugs that are killing the other parts of this community."  (Emphasis added.)  (Tr. at 72-73.)  Of note, the state did not allege that any of the three defendants posed any danger to any particular person.

{¶ 57} In addressing this condition, the trial court found the state's contention "that there's a danger that these *three individuals* will continue the distribution of drugs pending their pretrial release[]" to be "kind of tenuous" and opined that such concerns "could also be ameliorated with pretrial conditions."  (Emphasis added.)  (Tr. at 86-87.)  And, again, detectives did not claim to have observed Ivan sell, manufacture, or possess drugs at any point during their investigation.

{¶ 58} The state also elicited testimony from Detective Walker about the general danger firearms pose to the community and his belief that some firearms associated with the group may not be accounted for.  (*See* Tr. at 26, 37-38.)  Detective Walker told the trial court that detectives were unable to match some of the magazines recovered from Unit 4281 with the "numerous firearms" they recovered from that storage unit, the single Browning rifle seized from Unit 5021, or the "numerous firearms" found in Jessica and Raymundo's room at the Rosslare Harbour apartment.  (*See* Tr. at 26, 29, 38.)  In closing, the state contended that "[t]he firearms that were found also pose a risk to the community[,]" even though Detective Walker's testimony established that any firearm found was seized by the police.  (*Compare* Tr. at 72, *with* Tr. at 26-29, 59.)  Citing the general notion that "drug trafficking, drug dealing often results in firearm offenses" (it did not here), the trial

prosecutor also posited that "***these defendants*** certainly have the means to access those types of firearms that are, quite frankly, killing the community." (Emphasis added.) (Tr. at 72-73.) But the state did not present any concrete evidence to suggest Ivan had access to any firearms—much less a risk he would use one.

{¶ 59} My review of the record compels me to conclude that the trial court's decision to deny Ivan's bail was most glaringly wrong because the state did not present any ***evidence*** at the hearing to support the finding that Ivan "pose[d] a substantial risk of serious physical harm to any person or to the community." *See* R.C. 2937.222(A), (B). Although R.C. 2937.222(C)(3) permitted the trial court to consider Ivan's history and characteristics when it evaluated whether he posed a substantial risk of serious physical harm to the community, the state presented no relevant information about him—*e.g.*, prior arrests, prior bad acts, other pending charges—at the hearing. Certainly, a plain reading of the denial-of-bail statute confirms that the general (and often emphasized) nexus between drugs and guns cannot, alone, establish the evidentiary support the second condition requires. Indeed, the critical calculus is not that certain types of offenses are thought to be indicative of firearms possession (or even use), but, instead, whether evidence presented by the state about a ***particular*** defendant at the denial-of-bail hearing sufficiently suggests a "substantial risk" that the ***particular*** defendant will cause "serious physical harm" to the community or another person if released on bond prior to trial.

{¶ 60} Therein lies the fault, in my opinion, with the analysis below. The trial court found Detective Walker's testimony about the unaccounted-for firearms to be compelling and concluded the state carried its burden in establishing a danger to the community if "***these three*** are released" on bond while awaiting trial. (Emphasis added.) (Tr. at 87.) The trial court explained that its finding was "based entirely upon * * * [the] arsenal that was found at the residence and the fact that [testimony] also indicates unaccounted-for guns." (Tr. at 87-88.) More precisely, the trial court cited testimony about the magazines recovered from Unit 4281 "that didn't have a partner[]" and expressed concern about "Glock switches" that were not recovered but were instead indicated in "videos and photos from their phones" observed by detectives. (Tr. at 88. *See* Tr. at 38, 67-68.) Though, of note, Detective Walker did not claim any of the three defendants were depicted in videos or photos possessing any of the firearms he described seeing in the media items extracted from

the cell phones. (*See* Tr. at 38.)  Ultimately, the trial court pronounced that "the size and the type of the weapons * * * found in the residence, the fact that * * * there are unaccounted-for weapons * * * [was] sufficient for me to raise the danger issue."  (Tr. at 88.)

{¶ 61} Though its contemplation of the matter is brief, the majority similarly concludes that Detective Walker's "testimony about the scale of the drug trafficking operation and the quantity and type of weapons law enforcement officers did not recover is sufficient to establish, by clear and convincing evidence, that Ivan posed a substantial risk of serious physical harm to the community."  (Majority at ¶ 26.)

{¶ 62} One flaw in both the majority opinion and the trial court's decision is that both fail to appreciate the meaning of a key operative phrase in the statute: "substantial risk."  To satisfy the second denial-of-bail condition, the state was required to show—and the trial court find—"by clear and convincing evidence that [Ivan] poses a ***substantial risk*** of serious physical harm * * * to the community."  (Emphasis added.)  R.C. 2937.222(A), (B).  "Substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."  R.C. 2901.01(A)(8).

{¶ 63} The trial court found the firearms-related evidence sufficiently "raise[d] the danger issue" (Tr. at 88), but such finding is not equivalent to the "substantial risk of serious physical harm" finding R.C. 2937.222(B) requires.  Even if it was, nothing in the record established that Ivan ever had the ability to access the numerous firearms recovered, or the seized unmatched magazines, or the unrecovered firearms that matched that ammunition.  (*See* Tr. at 26, 29.)  Furthermore, Detective Walker conceded that he did not have any DNA evidence linking the seized firearms from either the storage unit or residence to Ivan.  (*See* Tr. at 59-60.)  And, nothing in the record suggests detectives ever specifically observed Ivan possess any firearms, including in videos and photos extracted from the phones seized by the police.  Furthermore, and quite significantly, the record does not suggest Ivan had a history of being violent toward others.

{¶ 64} Thus, the conclusion reached by both the trial court and the majority—that guns, ammunition, and drugs not attributable to Ivan are sufficient to establish, by clear and convincing evidence, that Ivan posed a substantial risk of serious physical harm to the

community—is analytically puzzling. This is because neither the trial court nor the majority opinion meaningfully engage with the evidence presented at the denial-of-bailing hearing or otherwise explain how that evidence meets what the controlling statute requires.

{¶ 65} The majority also fails to consider the improper inference stacking on which both its and the trial court's analysis rely. It is well-established in Ohio that "an inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by [the trier of fact]." *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus. For this reason, "[a] finding of substantial risk may not be based on an inference upon an inference in order to transform a speculative risk into a substantial risk." (Internal quotations and citations omitted.) *State v. Hartley*, 194 Ohio App.3d 486, 2011-Ohio-2530, ¶ 27 (1st Dist.).

{¶ 66} Essentially, the position of the trial court and the majority is that because some unmatched magazines were found in the storage unit and some of the unattributed phones recovered from the storage unit contained photographs of guns that were taken, received, or sent at some point in time by some unidentified person(s), the state's burden as to Ivan is met. I disagree.

{¶ 67} Equally tenuous is the majority's reasoning that Ivan poses a substantial risk of serious physical harm to the community because he is affiliated with people who are linked to firearms and a large-scale drug trafficking operation. (*See* Majority at ¶ 26.) The phones showed Raymundo counting large amounts of money (Tr. at 39) and educating customers on drug trafficking (*see* Tr. at 32). Detective Walker testified that information provided by the federal drug authorities suggested Jessica had direct ties to the cartel. (Tr. at 66.) He also described Raymundo and Jessica's prior charges in a 2018 case with similar facts. (Tr. at 39.) Noticeably absent from both Detective Walker's testimony and the majority opinion, however, is a recitation of particular evidence that supports finding ***Ivan*** poses a substantial risk of serious physical harm to the community. That is not to say that such evidence does not exist, but rather, that such individualized evidence about Ivan was not presented to the trial court at the combined denial-of-bail hearing.

{¶ 68} It goes without saying that firearms always pose an inherent risk of serious physical harm to the community. But, while the state may have presented sufficient

evidence to create some speculative risk posed by the existence of unaccounted-for firearms, Glock switches, and high-capacity magazines that some or all of the codefendants might be able to access, it is logically untenable to say that Detective Walker's testimony created a "strong possibility" that Ivan would cause "serious physical harm" to the community.  But, even more importantly, concluding otherwise would require the stacking of multiple inferences upon each other, which is legally impermissible.

{¶ 69}  Indeed, it could be appropriate to infer from the unmatched magazines seized in Unit 4281 that unaccounted-for firearms exist.  But the trial court's finding requires the stacking of additional inferences upon that inference: that Ivan is aware of the unrecovered firearms, knows where they are located, can get access to them, and will use them.  (*See* Tr. at 87-89.)  Even assuming that Ivan had access to the locations where firearms and unmatched magazines were seized ***and*** setting aside the impermissible inference-stacking issue, the trial court's analysis still did not comply with the dictates of the governing statute.  That is to say, the trial court failed to evaluate whether any evidence clearly and convincingly established a "strong possibility" that Ivan, specifically, would cause serious physical harm to the community.  The majority opinion fails to offer a convincing explanation of how that failure did not violate R.C. 2937.222(B).  And the majority does not articulate its rationale for finding that Detective Walker's testimony supports the specific finding the statute requires in order to deny Ivan pre-trial bail.

{¶ 70}  Because the state presented no evidence suggesting Ivan had access to these unaccounted-for guns and failed to otherwise prove, by clear and convincing evidence, that Ivan posed a substantial risk of serious physical harm to the community, I would find the trial court's denial of pre-trial bail in this case was contrary to law and unreasonable.

## III.  No Release Conditions Will Assure the Safety of the Community

{¶ 71}  R.C. 2937.222(B)'s third condition required the trial court to consider whether, if the accused posed a substantial risk of serious physical harm to any person or the community, the state proved "by clear and convincing evidence that no release conditions will reasonably assure the safety of that person and the community."  Again, the state did not claim any of the three defendants posed any risk of harm to any specific person.  Instead, it generally cited to the harm drugs, cartels, and firearms can inflict upon a community.

**{¶ 72}** Because I do not believe the state presented sufficient evidence to establish, clearly and convincingly, that Ivan, specifically, posed a substantial risk of serious physical harm to the community, addressing the third condition of the denial-of-bail statute is unnecessary.  However, given the disposition of this case and the process below, I believe it is prudent to do so.

**{¶ 73}** At the hearing, the state did not explicitly argue there were no conditions of release that would "reasonably assure the safety of * * * the community[]" from any "substantial risk of serious physical harm" posed by Ivan.  (*See* Tr. at 72-75.)  And Detective Walker's hearing testimony did not directly relate to this issue either.  Instead of focusing on whether pre-trial conditions would reasonably assure ***the safety of the community***, as required by R.C. 2937.222(A) and (B), the state instead presented evidence and arguments to support its contention that no pre-trial conditions would reasonably assure ***the appearance of the three defendants*** at their trials—i.e., flight risk.  (*See* Tr. at 38-41, 73-74.)

**{¶ 74}** The trial court found the state's evidence sufficiently established that all three defendants presented a substantial flight risk—a general bond consideration in all criminal cases.[3]  In support of this finding, the trial court cited to "ties to Mexico and other states for all three defendants; California and Utah."  (Tr. at 85.)  Because Ivan cannot be clearly connected to the red truck—described as making trips to Mexico, California, and Utah (Tr. at 16-20)—I cannot say the record supports this finding.  Other evidence regarding Ivan's

---

[3] Historically in Ohio, the "process of assessing bail [has been] governed by Crim.R. 46." *See DuBose*, 2022-Ohio-8 at ¶ 20. Among other things, Crim.R. 46 permitted courts to consider flight risk when setting a defendant's pre-trial bail. *See id.* at ¶ 27, quoting Crim.R. 46(C). In January 2022, the Supreme Court held in *DuBose* that a trial court could not consider a defendant's threat to public safety when setting the cash amount of bail. *See id.* at ¶ 33-34. In response, the Ohio General Assembly put forth a constitutional amendment that explicitly overruled *DuBose*'s holding and, more broadly, eliminated the Supreme Court's authority to set any bail procedures through rule. *See* Ballotpedia, *Ohio Issue 1*, *Determining Bail Amount Based on Public Safety Amendment (2022)*, https://ballotpedia.org/Ohio_Issue_1,_Determining_Bail_Amount_Based_on_ Public_Safety_Amendment_(2022) (accessed Dec. 1, 2023). Voters approved that amendment in November 2022.  *See*, *e.g.*, Court News Ohio, *Practice and Procedure Rule Proposals Filed with General Assembly*, https://www.courtnewsohio.gov/happening/2023/PracticeProcedureAmend_042823.asp (accessed Dec. 1, 2023). Based on that amendment's passage, the Supreme Court approved a repeal of Crim.R. 46, which took effect on July 1, 2023. *See id. See also* Supreme Court of Ohio, *Final Rule Amendments*, https://www.supremecourt.ohio.gov/ruleamendments/archive.aspx (accessed Dec. 1, 2023). The Ohio legislature recodified Crim.R. 46's bail procedures by enacting R.C. 2937.011, which took effect on June 30, 2023.

ties to Mexico is likewise wanting. (*See* Tr. at 39-40.) The trial court's flight-risk finding also relied on evidence of a "well-financed operation." (*See* Tr. at 85.) But, only Jessica was specifically described as "a member or associate of the Sinaloa Cartel." (Tr. at 34. *See also* Tr. at 66.) And, only $2,100 in cash was recovered when the storage units and residence were searched. (*See* Tr. at 40, 55, 66.) Without more, the record does not establish that Ivan had access to any significant amount of money. Additionally, the trial court generally referenced "the confiscation of fake passports and IDs in the place of residence." (*See* Tr. at 85.) Though, as already noted, the record does not indicate the quantity, quality, or type of "fraudulent IDs and documents" detectives seized that pertained to Ivan.[4] (*See* Tr. at 29-31, 39-40.) The trial court also cited to the fact that "they moved apartments at least once during the investigation[]" to support its finding that all three defendants posed a flight risk. (Tr. at 85.) But, while the circumstances of the move may invoke suspicion generally, I do not believe moving within the same county once over a six-month timeframe is inherently indicative of a flight risk.

{¶ 75} The majority opinion generally echoes these same findings, but also acknowledges the trial court's explicit pronouncement that it could not deny pre-trial bond on the basis of flight-risk concerns alone. (*See* Majority at ¶ 28. *See* Tr. at 81, 86.) Indeed, the Ohio Supreme Court recently recognized that flight risk concerns "can be addressed by other means, such as a daily reporting requirement to a probation officer and electronic monitoring." *DuBose*, 2022-Ohio-8 at ¶ 32, *overruled on other grounds by constitutional amendment*. But to deny Ivan the right to pre-trial bond entirely, the record must contain sufficient evidence from which the trial court could form a firm belief or conviction that no release conditions will reasonably assure the ***safety of the community***–not Ivan's attendance in court. R.C. 2937.222(C). *See State ex rel. Sylvester v. Neal*, 140 Ohio St.3d 47, 2014-Ohio-2926, ¶ 16, citing *State ex rel. Baker v. Troutman*, 50 Ohio St.3d 270, 272 (1990) ("The sole purpose of bail is to ensure a person's attendance in court.").

{¶ 76} In finding the state's evidence satisfied the third denial-of-bail condition, the trial court simply stated it did not "believe any release conditions would reasonably assure

---

[4] In addition to fleeing to avoid prosecution, it is worth noting that there are other reasons—e.g., undocumented status, underage purchase of age-restricted items, financial crimes—why a person may have fraudulent identification documents.

the safety of the public from those [unaccounted-for] weapons." (*See* Tr. at 88.) But even presuming the trial court's finding that Ivan presented a substantial flight risk was sufficiently supported by the record—as discussed above, I do not believe that it was—I would nonetheless find the trial court's analysis of the third condition failed to comply with the dictates of R.C. 2937.222(B). That is true for three reasons.

**{¶ 77}** First, the state presented no evidence on whether any pre-trial conditions could reasonably assure *the safety of the community* if Ivan were released on bail. Thus, the trial court had no evidentiary basis to find there were not. *See* R.C. 2937.222(A), (B). *See also State v. Dickey*, 1st Dist. No. C-220536, 2023-Ohio-705, ¶ 17-18. And, of note, the majority opinion does not claim otherwise. (*See* Majority at ¶ 27-29.) Evidence suggesting that no bond conditions could reasonably assure a defendant's appearance at trial is not commensurate with proof that the community's safety could not reasonably be assured by any release conditions.

**{¶ 78}** Second, the trial court's finding relied on evidence that could not be specifically connected to Ivan. After finding the "size and type" of the weapons recovered and the speculative evidence about the unaccounted-for weapons was "sufficient * * * to raise the danger issue[,]" the trial court pronounced the following:

> I'm also going to find that because that is the issue, it's not a question of GPS. It's not a question of maintaining their location. I don't believe any release conditions would reasonably assure the safety of the public from those weapons.
>
> So that being said, I find that the State has carried its burden in this no-bond motion.

(Tr. at 88.)

**{¶ 79}** Fatal to such finding, however, is the absence of any evidence in the record connecting *Ivan* to these firearms, as discussed above. And, even assuming he had the ability to access the unaccounted-for firearms—or, for that matter, any of the millions of guns lawfully and unlawfully possessed by civilians in this country[5]—the state presented no specific evidence at the hearing to suggest, much less clearly and convincingly prove, that

---

[5] *See* Jennifer Mascia and Chip Brownlee, *How Many Guns Are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total (accessed Dec. 1, 2023).

there was a "strong possibility" Ivan would access and use them. Surely, the general existence of other firearms in the world cannot be sufficient to establish the clear-and-convincing standard required by R.C. 2937.222(B).

{¶ 80} Finally, neither the trial court nor the majority opinion meaningfully consider whether any pre-trial conditions *other than GPS monitoring* would reasonably assure the safety of the community if Ivan were released on bail while awaiting trial. For instance, the trial court did not evaluate whether house arrest or other pre-trial conditions would reasonably protect the community from the possibility that Ivan might access and use guns. Although the state elicited testimony from Detective Walker about Jessica and Raymundo's prior trafficking charges and flight to Mexico after being released on bail, Jessica's suspected cartel affiliation, and the suspected solvency of the cartel (*see* Tr. at 31-34, 39, 65-66), Detective Walker did not testify about Ivan's prior criminal history (if any) or otherwise claim Ivan was a member of the cartel.

{¶ 81} Like the trial court, the majority does not engage in an analysis as to whether any conditions would keep the community safe. Instead, the majority confuses the fact that Ivan might be a flight risk—which is a standard bond consideration, but not a basis for denying bond under R.C. 2937.222—with what the statute's third no-bond condition actually requires. The majority cites as support evidence suggesting Ivan would have access to "additional currency that could facilitate flight from the United States if [he was] released on bond." (Majority at ¶ 28.) But the majority does not explain how its concern that no bond conditions would reasonably assure Ivan's *presence* at trial is relevant to the determination of whether any release conditions would reasonably assure the *safety of the community*. Instead of engaging in that analysis, the majority—like the trial court— then concludes that the large quantities of both the seized and unaccounted-for firearms somehow "indicate[s] that no release conditions * * * could reasonably assure the safety of the community[]" from Ivan, notwithstanding the absence of any evidence suggesting Ivan had, could, or would ever possess, use, or otherwise come into contact with such weapons. (*See* Majority at ¶ 29.)

{¶ 82} Before denying Ivan bail, the trial court was required to find, by clear and convincing evidence, that no release conditions would reasonably assure the safety of the community. R.C. 2937.222(B). However, nothing in the record suggests it meaningfully

considered whether any condition other than GPS monitoring would suffice or relied on evidence specific to Ivan when it concluded there was not.

{¶ 83} It is not my position that the state cannot meet the requirements of the third condition, but, rather, that the trial court's analysis and findings did not adhere to what the statute requires. As such, I would find the trial court failed to comply with R.C. 2937.222(B) when it analyzed the third condition supporting the denial of bail.

## IV. Conclusion

{¶ 84} Because I do not find the record before this court contains clear and convincing evidence of all three conditions required to deny Ivan bail under R.C. 2937.222, I would sustain the sole assignment of error, reverse the trial court's January 13, 2023 judgment, and remand this matter for further proceedings consistent with the governing statute and the Ohio Constitution.

_____